**STATE of Missouri, Respondent,**

v.

**Robert A. BOUSER, Appellant.**

**No. WD 55745.**

Missouri Court of Appeals,
Western District.

Dec. 14, 1999.

As Modified March 28, 2000.

Motion for Rehearing and/or Transfer to
Supreme Court Denied March 28, 2000.

Application for Transfer Denied
May 30, 2000.

Andrew A. Schroeder, Asst. Appellate Dist. Defender, Kansas City, for appellant.

Philip M. Koppe, Asst. Atty. Gen., Kansas City, for respondent.

Before: EDWIN H. SMITH, P.J., HOWARD, J., and TURNAGE, Sr.J.

HOWARD, Judge.

Robert A. Bouser (Mr. Bouser) was jury-tried and convicted as a persistent offender of second degree murder pursuant to § 565.021.1(2),[1] for which he was sentenced to eighteen years in prison.

Mr. Bouser asserts that the trial court erred: (1) in instructing the jury as to second degree felony murder based on the underlying felony of abuse of a child because that felony "merged" into the resultant homicide, and (2) in refusing to admit evidence that someone else had the opportunity to cause the injuries to the victim on the grounds the evidence was "irrelevant and immaterial."

The judgment is affirmed.

### Facts

Appellant does not question the sufficiency of evidence to sustain his conviction, and a reasonable jury could find:

In February of 1997, J.M.P., a 15–month–old boy, lived in a small, two-bedroom duplex in Grandview, Missouri, with his mother, Krystal Judkins, his grandmother, Sherry McMannama, and his brother and sister, C.J. and S.P. His mother's boyfriend, appellant Robert Bouser, had also been living at the duplex with his family since November of 1996.

J.M.P. was just beginning to walk. On February 5, 1997, he fell and hit his head on the cement floor of a laundromat. Although a "knot" formed on the right side of his forehead and he cried for about ten minutes, J.M.P. quickly resumed playing and was "fine." That same evening, showing no apparent signs of injury, J.M.P. actively played with his brother and sister.

Due to recent surgery on the harelip and cleft palate J.M.P. was born with, it was necessary that he be given sponge baths. While bathing her son that night,

Ms. Judkins did not notice scrapes or cuts anywhere on J.M.P.'s head or anywhere else on his body. Later J.M.P. fell asleep 20 minutes after his grandma gave him his bedtime bottle and put him to bed. He awoke once in the night because he was "cutting some teeth." His grandma fed him another bottle, gave him Tylenol and rubbed teething lotion on his gums. J.M.P. then fell back to sleep.

The next morning, February 6, 1997, both Ms. McMannama and Ms. Judkins awoke for work. After C.J. left for school on the bus, Ms. Judkins looked in on J.M.P. and S.P. Both were sleeping as usual, as was Mr. Bouser who had agreed to watch the children that day. Ms. Judkins and Ms. McMannama left around 9:00 a.m. for work. Only Mr. Bouser, S.P., and J.M.P. remained at the duplex.

That afternoon, Ms. McMannama returned to the duplex around 4:00 p.m. Mr. Bouser informed her he believed J.M.P. had fallen on some toys on the floor of his room, and he thought the boy was "breathing funny." When she checked on J.M.P., she observed that one of his teeth appeared loose, and he had a small cut on his mouth. She left to pick up Ms. Judkins at work. They returned home about thirty minutes later, and J.M.P. lay motionless on the living room couch. Mr. Bouser told them, "[J.M.P.] just fell over and collapsed." Ms. McMannama then called 911 using the neighbor's phone.

Considered a "critical pediatrics" case, J.M.P. was taken by the ambulance to Children's Mercy Hospital with Ms. Judkins riding along. The paramedic's initial diagnosis indicated that the boy was in shock, and his "brain was having some type of significant trouble." J.M.P. exhibited significant breathing and circulation problems. Upon removal of J.M.P.'s clothing, the paramedic observed "several bruises to the face, to the neck area, and to the chest and abdomen." Ms. Judkins was upset and would not answer the par-

---

1. All statutory references are to RSMo 1994 unless otherwise noted.

amedic's questions as to the origin of her son's bruises.

He arrived at Children's Mercy at 5:20 p.m., February 6, 1997, and was treated by an emergency trauma team. Due to the severity of his injuries, he died the following day.

On February 10, 1997, Detectives Van-Winkle and McKinstry arrested Mr. Bouser "for investigation of killing J.M.P." and transported him to the Grandview police station. Mr. Bouser waived his Miranda rights and gave a statement as to what occurred on the day of February 6, 1997, when he was the only adult with S.P. and J.M.P. A synopsis of Detective VanWinkle's testimony, (verbatim where indicated by quotes) follows:

Mr. Bouser recounted that he agreed to watch the kids that day. After they woke up and he fixed breakfast, S.P. had scattered her toys everywhere in the children's bedroom, and J.M.P. had "shit all over himself." He had to bathe him and clean up the mess. In describing both incidents to the detective, Mr. Bouser "became agitated" and "shifted around" in his seat. Mr. Bouser explained that later, while he was in the living room and the children were in their bedroom, he heard J.M.P. cry. He went in to check on him again. He discovered the boy had a loose tooth and small amount of blood on his mouth. From this, he speculated that perhaps the boy had fallen on some of the toys on the floor or on the bedroom table. He told the detective that "except for a little cold ... [J.M.P.] had acted fine all week.... He might have had a little bit of a breathing problem but it was not anything serious. It was just something that kids get." After Ms. McMannama arrived home and then went to call and pick up her daughter, Mr. Bouser described to the officer that he had set J.M.P. on the couch next to him, and, "next thing he knew, J.M.P. rolled over backwards and kind of went limp.... He said he picked him up by the arms and shook him ... trying to get him to respond, and ... he didn't respond." When accused of the "murder" of J.M.P., Detective VanWinkle observed Mr. Bouser's "low voice" denial, but it was not "much of a strong denial."

At trial, doctors from the trauma team and the medical examiner who performed his autopsy testified for the State. Injuries to J.M.P.'s brain included: a small "acute, severe" subdural hematoma (blood in the space around the brain), a "cerebral edema" ("diffused swelling" of the brain causing an interruption in the blood supply to the brain), and a "subarachnoid hemorrhage" (blood in the space on top of the brain). The doctors also found extensive bruising on J.M.P.'s body, numerous retinal hemorrhages, abdominal injuries including a large laceration or cut through his liver, damage to the right adrenal gland, a large amount of blood within the abdominal cavity, and signs that J.M.P. was "in shock" (his blood was not properly circulating through his vital organs).

The doctors all testified that J.M.P.'s injuries could not have resulted from falling onto a pile of toys, bumping his head on a table or falling on the cement while trying to walk. The head and abdominal injuries resulted from direct, intentional "blunt traumas" of significant force to the baby's head and to his abdomen. The medical experts were unable to pinpoint exactly when the injuries were sustained or which life-threatening injury ultimately caused his death. However, their testimony showed that if J.M.P.'s severe injuries occurred prior to February 6, 1997, he could not have awoken on February 6th, could not have played or eaten in any normal fashion, and overall "he would have been significantly abnormal." Each medical witness also testified that J.M.P., with these significant injuries, could not have been sitting normal in an adult's lap and then have suddenly collapsed as Mr. Bouser contended.

Mr. Bouser was subsequently convicted of second degree murder pursuant to

§ 565.021.1(2). After finding him to be a "persistent offender" under § 558.016.3, the trial judge sentenced Mr. Bouser to eighteen years. Mr. Bouser filed a motion for a new trial raising the same issues set forth in this appeal. The trial court denied Mr. Bouser's motion, and this appeal followed.

### Point I

Mr. Bouser contends the court erred in instructing the jury as to second degree felony murder based on the underlying felony of abuse of a child. He argues felony abuse of a child, analogous to assault, "merged" into the homicide offense. This is because that felony "is not a separate and independent offense of homicide, but actually result[ed] in the victim's death" thereby precluding its use as a predicate felony for a conviction of second degree felony murder. Mr. Bouser requests that his conviction and sentence for felony murder in the second degree be reversed, and therefore requests that the case be remanded either for a new trial or for re-sentencing for the offense of involuntary manslaughter.

Prior to the jury retiring for consideration, Mr. Bouser specifically objected to the giving of Instructions No. 10 and No. 11. Mr. Bouser likewise raised the objections in his motion for new trial. Rule 29.11. Thus, this court will review for error the giving of Instruction No. 10 and No. 11. Rule 28.03.

### MISSOURI'S FELONY–MURDER STATUTE AND THE MERGER DOCTRINE

Throughout the trial, Mr. Bouser argued the court should not instruct the jury on second degree felony murder because of the merger doctrine. His pretrial motion to dismiss, motions for judgment of acquittal, and his objections to the submission of Instructions No. 10 and No. 11, were all

**2.** Instruction No. 10 was patterned on M.A.I. 322.12. Instruction No. 11 was patterned on

based on, among other theories not herein appealed, the concept of merger. He does not assert a double jeopardy violation. All motions and objections concerning merger were considered by the trial judge and denied or overruled. Before submitting the case to the jury, the trial judge instructed it as to conventional second degree murder, felony second degree murder based on the underlying felony of child abuse (Instructions No. 10 and No. 11) and involuntary manslaughter. Instructions No. 10 and No. 11,[2] under which the jury convicted him and upon which appellant's first point rests, follow:

### INSTRUCTION NO. 10

If you find and believe from the evidence beyond a reasonable doubt:

First, that on or about February 6, 1997, in the County of Jackson, State of Missouri, the defendant caused multiple injuries to [J.M.P.] by means of blunt force trauma, and

Second, that in doing so, defendant inflicted cruel and inhuman punishment upon [J.M.P.], and

Third, that [J.M.P.] was then less than seventeen years old, and

Fourth, that defendant knew his conduct was inflicting cruel and inhuman punishment upon a child less than seventeen years old,

then you will find that the defendant has committed abuse of a child.

However, unless you find and believe from the evidence beyond a reasonable doubt each and all of these propositions, you must find the defendant not guilty of abuse of a child.

\* \* \*

### INSTRUCTION NO. 11

If you do not find the defendant guilty of murder in the second degree as sub-

M.A.I. 313.06.

mitted in Instruction No. 8, you must consider whether he is guilty of murder in the second degree under this instruction.

If you find and believe from the evidence beyond a reasonable doubt:

First, that defendant committed the felony of abuse of a child, as submitted in Instruction No. 10, and

Second, that defendant killed [J.M.P.] by means of blunt force trauma, and

Third, that [J.M.P.] was killed as a result of the perpetration of that abuse of a child,

then you will find the defendant guilty of murder in the second degree.

However, unless you find and believe from the evidence beyond a reasonable doubt each and all of these propositions, you must find the defendant not guilty of murder in the second degree under this instruction.

If you do find the defendant guilty of murder in the second degree, you will return a verdict finding the defendant guilty of murder in the second degree.

The felony-murder rule can be traced as far back as Lord Coke, who, in 1797, pronounced, "[i]f the act be unlawful, it is murder." 3 Edward Coke, INSTITUTES OF THE LAWS OF ENGLAND (London 1797). At common law, there were no degrees of murder. A homicide was either murder or manslaughter. "[N]ot only was it murder to kill another, though the intent was merely to severely hurt, but a homicide unintentionally committed in pursuit of a felony was murder, and was punishable with death." *State v. Clark*, 652 S.W.2d 123, 125 (citing WHARTON ON HOMICIDE § 105, at 147 (3d ed.1907)).

■ The felony-murder rule "permits the felonious intent necessary to a murder conviction to be shown by the perpetration of or attempt to perpetrate a felony."

*State v. Chambers*, 524 S.W.2d 826, 829 (Mo. banc 1975), *overruled on other grounds by State v. Morgan*, 592 S.W.2d 796, 801 (Mo. banc 1980). Proving one intended to commit the underlying felony "raises a conclusive presumption that the defendant possessed the necessary felonious intent to support conviction for the resulting murder." *Id.*

The merger doctrine, initially a judicial creation, is "a means of limiting or barring application of the felony-murder rule" where the underlying felony is the very act that caused the homicide. *State v. Coody*, 867 S.W.2d 661, 664 n. 1 (Mo.App. S.D. 1993). This form of limitation was first adopted by Missouri in *State v. Shock*, 68 Mo. 552 (1878). The *Shock* court interpreted the felony-murder statute in effect at the time to not include "those acts of personal violence to the deceased which are necessary and constituent elements of the homicide itself, and are, therefore, merged in it." *Shock*, 68 Mo. at 561.

In *Shock*, a three-two decision, the defendant beat the six-year-old deceased with a pole and grapevines over the course of fifteen minutes, ostensibly as punishment. *Id.* at 557. The boy died several days later and defendant was convicted of first degree murder and sentenced to be hanged. *Id.* The first degree murder statute in effect at the time of the *Shock* decision read:

> Every murder which shall be committed by means of poison, or by lying in wait, or by any other kind of willful, deliberate and premeditated killing, or which shall be committed in the perpetration or attempt to perpetrate any arson, rape, robbery, burglary or *other felony*, shall be deemed murder in the first degree.

Wagner's Stat. (1872) c. 42, art. 2, s.1, p. 445 (emphasis added).[3] The *Shock* jury was instructed, in part, as follows:

> slaughter, or justifiable or excusable homicide, shall be deemed murder in the second

---

**3.** The second degree murder statute in effect at the time read, "All other kinds of murder at common law, not herein declared to be man-

If the jury believes, from the evidence, that it was not the intention of the defendant to kill the child Scott, by whipping him, but that he did intend to do him *great bodily harm*, and in so whipping him, death ensued, he is guilty of murder in the first degree.

*Shock*, 68 Mo. at 558 (emphasis added). The issue in *Shock* was whether inflicting "great bodily harm" was an "other felony" constituting first degree murder. The *Shock* court's analysis was conducted within a much different legal context and interpreted very different criminal statutes than exist today and accordingly is of little value in our case.

Analyzing the applicable felony statute of the day, the *Shock* court stated that the "bare" infliction of great bodily harm was not a felony at common law, nor was it made so by the specific statute's language and concluded it was not, under the circumstances of the case, an "other felony." *Id.* at 560–61.[4] Because the statute made infliction of great bodily harm a felony only when death did *not* ensue, the court reasoned that in cases where death did ensue, it was not a felony. *Id.* at 559. Accordingly, such an assault could not be an underlying or "other felony" to support felony murder. Of course, our statutes are much different today, and it is clear that, under present law, such an assault is a felony regardless of whether death ensues.

The *Shock* court also doubted that the words "other felony" could include offenses other than the specifically listed felonies, i.e., arson, rape, robbery and burglary, and feared adopting a broader interpretation would engulf the other degrees of murder, potentially making the commission of any

felony first degree murder. *Id.* at 562–63. As will be discussed below, subsequent legislation eliminates this concern.

Additionally, *Shock* pronounced that when a felony-murder statute uses the word "murder" instead of "homicide," a killing must constitute a common law murder to come within the statute, i.e., there must have been an intent to kill. *Id.* at 559–60. This view, regarding intent to kill, would not prevail over time.

In Missouri, until 1984, felony murder could be classified as either first or second degree murder, depending on the underlying felony, although much more judicial attention was focused on first degree murder provisions. Unlike the present case, *Shock* involved murder in the first degree, and accordingly, the second degree statute received little analysis. However, in the subsequent case of *Clark*, when analyzing the same second degree murder statute as in effect during *Shock*, the court defined the "all other kinds of murder" language to be: "(1) Intentional murder, nondeliberate, and (2) homicides committed in the perpetration of or attempt to perpetrate *any* felony other than the five listed in the first degree murder statute." *Clark*, 652 S.W.2d 123, 127 (Mo. banc 1983) (citing M.A.I.—CR 2d 15.16, "Notes on Use," n. 3) (emphasis in original). The *Clark* court saw no other limitation on the type of felony to support such a charge.

In 1932, the Missouri Supreme Court discussed the *Shock* opinion in *State v. Glover*, 330 Mo. 709, 50 S.W.2d 1049, 1051 (1932). The court's understanding of *Shock*'s conclusions were:

[T]he first degree murder statute embraced only killings which would have

---

degree." Wagner's Stat. (1872) c. 42, art. 2, s.2, p. 445.

4. The "great bodily harm" statute read as follows:

If any person shall be maimed, wounded or disfigured, or receive great bodily harm, or his life be endangered by the act, procurement, or culpable negligence of another, in cases under circumstances *which would constitute murder or manslaughter, if death had ensued*, the person by whose act, procurement or negligence such injury or danger of life shall be occasioned, shall in cases not otherwise provided for, be punished by imprisonment in the penitentiary.

Mo. Rev. Stat. Ch. 200, *Crimes and Punishments*, art. II § 33 (1872) (emphasis added).

been murder at common law; that is was merely a statute of classification, not of definition; and, since at common law there could be no murder without an intent to kill, such intent was necessary under the constructive murder statute. [As a result, *Shock* ] held . . . that if . . . one person assail another, though without intending to kill him, and the latter person die, the assault and its result [were] all one offense[.] . . . [T]he assault [was] simply a constituent element of the homicide, merging therein, and not a separate, independent felony. . . . [Thus, under the first degree murder statute as it then read,] the words "or other felony" appearing therein referred to some collateral felony, like arson, robbery, etc., and not to acts which themselves constituted the homicide.

*Id.* As pointed out in *Glover,* in response to the *Shock* opinion, the legislature, the next year, amended the first degree murder statute. *Id.* The words "or other felony" were stricken from the statute and replaced by "or mayhem." § 1232, RSMo 1879. In effect, except as to the specifically enumerated felonies of arson, rape, robbery, burglary and mayhem, the legislature clarified that felony murder could not be charged as first degree murder.

As noted by *Glover,* the case of *State v. Hopkirk,* 84 Mo. 278, 287 (1884) partially overruled *Shock.* In *Hopkirk,* the court agreed that the felony-murder statute was a statute of classification instead of definition and only embraced killings that would have been murder at common law. *Id.* at 287. However, it "denied that at common law no homicide could be murder, unless there was an intent to kill." *Id.* Instead, *Hopkirk* edged the law closer to our present concepts by affirming that "at common law, a homicide committed in the perpetration of a felony was murder, and this, whether there was any precedent intention of the homicidal act or not." *Id.*

Most of the cases discussing this aspect of felony murder in depth were written in the 1800's. A large portion of the courts'

analyses of the felony-murder statutes in effect in the older cases focused on their conflicting beliefs of the significance of what constituted "murder" at common law, i.e., the courts drew a distinction between "murder" at common law and "homicide." *Hopkirk,* 84 Mo. at 289. In 1885, evidently to put the question at rest, the legislature amended the first degree felony-murder statute so that it read, as it did until 1975:

> Every murder which shall be committed by means of poison, or by lying in wait, or by any other kind of willful deliberate and premeditated killing and every *homicide* which shall be committed in the perpetration or attempt to perpetrate any arson, rape, robbery, burglary or mayhem, shall be deemed murder in the first degree.

*Glover,* 50 S.W.2d at 1052; MISSOURI LAWS, 1885, p. 138 (emphasis added).

In the years since *Shock,* only a few cases have embraced the issues of felony murder and the merger doctrine. The cases repeat variations of the theme in *Shock. See State v. Cook,* 560 S.W.2d 299, 304 (Mo.App.1977) (discussing whether the underlying felony was a "distinct or separate felony" not an "integral part" of the homicide); *State v. Hanes,* 729 S.W.2d 612, 617 (Mo.App. E.D.1987) (discussing whether the underlying felony was "independent of" the homicide); *State v. Rogers,* 976 S.W.2d 529, 533 (Mo.App. W.D.1998) (discussing whether the underlying felony was a "separate and distinct act"); *State v. DeJournett,* 868 S.W.2d 527, 533 (Mo.App. S.D.1993) (declining to determine the continued viability of the doctrine because it was not applicable to the case). Although the statutes impacting on the felony-murder rule have evolved significantly over the years, none of the more recent cases have analyzed the applicable legislative language and its effect on the continued viability of the merger doctrine. Certainly, the present felony-murder statute, in effect since 1984, has not undergone such

analysis. We feel the legislature's pronouncements are clear and dispositive.

### Legislative Intent

In the late 1800's the legislature, at least in part reacting to the changing judicial interpretations of its laws, fashioned the murder statutes which would remain essentially unchanged until the 1970's when the legislature began revising the first and second degree murder statutes. The first degree felony-murder statute remained essentially the same from 1885 until 1975, when the legislature created separate sections for intentional, premeditated "capital murder," § 559.005, and for first degree, unpremeditated, unintentional felony murder based on those felonies enumerated in the 1879 statute (except kidnapping replaced mayhem), § 559.007. The "or other felony" language was again left out. The 1983 legislature repealed all former versions of first and second degree murder and rewrote each. The 1975 distinction between capital murder and first degree murder was repealed and replaced by a first degree murder statute which eliminated all forms of first degree felony murder. § 565.020.1 RSMo Supp.1983. Felony murder was reclassified as second degree murder with a killing in the perpetration of "any felony" serving as a basis for establishing the reckless intent then required for second degree murder. § 565.021.2 RSMo Supp.1983.

The relevant portion of Missouri's second degree murder statute, amended in 1983 and effective October 1, 1984, reads as follows:

1. A person commits the crime of murder in the second degree if he:

(1) Knowingly causes the death of another person or, with the purpose of causing serious physical injury to another person, causes the death of another person; or

(2) Commits or attempts to commit *any felony*, and, in the perpetration or the attempted perpetration of such felony ... another person is killed as a result of the perpetration or attempted perpetration of such felony ...

2. Murder in the second degree is a class A felony, and the punishment for second degree murder shall be in addition to the punishment for commission of a related felony or attempted felony, *other than murder or manslaughter.*

§ 565.021 (emphasis added). Upon a literal reading of the statute, there is no mention of merger nor is there mention of limits on, or specifics about, the felony being used to support a charge of second degree felony murder.

The Legislature's prerogative is to define crimes and set the punishment for offenders, and this prerogative is given great latitude. "Courts are without authority to read into a statute a legislative intent contrary to the intent made evident by the plain language, even when a court may prefer a policy different from that enunciated by the legislature." *State v. Smith,* 972 S.W.2d 476, 479 (Mo.App. W.D. 1998). Accordingly, we examine the statute in order to determine "the intent of the legislature from the language used, to give effect to that intent if possible, and to consider words used in the statute in their plain and ordinary meaning." *Farmers' & Laborers' Coop. Ins. Ass'n v. Director of Revenue,* 742 S.W.2d 141, 145 (Mo. banc 1987).

Specifically, we must decide if our legislature intended for certain felonies, such as abuse of a child, to be used as an underlying felony for a conviction of second degree felony murder. Or, in other words, whether particular felonies, such as assault, merge into the resulting homicide thereby precluding the use of the felony to support a second degree felony murder charge. As set forth above, § 565.021.1(2) clearly references *"any felony"* in defining this crime. The term "any" connotes, "one, no matter what one: EVERY – used as a function word especially in assertions and denials to indicate one that is selected without restriction or limitation of choice."

WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 97 (1981). This court does not recognize ambiguity in this term. Just as "the word 'any' as used in a constitutional provision is 'all-comprehensive, and is equivalent to "every," ' ' " it should also be construed as "all-comprehensive" in a statutory provision. *Boone County Court v. State,* 631 S.W.2d 321, 325 (Mo. banc 1982) (quoting *State ex rel. Randolph County v. Walden,* 357 Mo. 167, 206 S.W.2d 979, 983 (1947)).

The plain and ordinary meaning of "any," therefore, indicates our legislature intended that *every* felony could serve as an underlying felony for the purpose of charging a defendant with second degree felony murder pursuant to § 565.021.1(2). Nowhere does the statute limit the felony to be used in charging under this statute to any particular type of or specific felony, i.e., inherently dangerous, as some other states have done. *See,* e.g., Kan. Stat. Ann. 21–3401; Miss.Code Ann. § 97–3–19; Iowa Code § 707.2.

In 1983, Missouri had a first degree felony-murder statute that read:

> Any person who unlawfully kills another human being without a premeditated intent to cause the death of a particular individual is guilty of the offense of first degree murder if the killing was committed in the perpetration of or in the attempt to perpetrate *arson, rape, robbery, burglary, or kidnapping.*

§ 565.003 RSMo 1978 (emphasis added). The emphasized offenses were felonies the legislature specified in order to "bump the charges up" to first degree from second degree murder, then defined as, "[a]ll other kinds of murder at common law, not herein declared to be manslaughter or justifiable or excusable homicide ..." § 565.004 RSMo 1978.

In 1983, the legislature repealed the first and second degree murder statutes,

and effective October 1, 1984, first degree murder required a showing that defendant "knowingly caus[ed] the death of another person after deliberation upon the matter," § 565.020 RSMo 1984. Second degree felony murder was amended with the "any felony" language as reflected today in § 565.021.1(2).[5] These amendments evidence the legislature's intent to eliminate first degree felony murder. It clearly chose to instead solely classify felony murder under the second degree murder statute and to delineate *"any felony"* as being capable of supporting a second degree felony murder conviction under § 565.021.1(2). If the legislature had desired to limit underlying felonies, it would have done so, as it had done for the previous first degree murder statute.

■ As to the underlying felony, "Abuse of a child" pursuant to § 568.060, reads:

> 1. A person commits the crime of abuse of a child if such person:
>
> > (1) knowingly inflicts cruel and inhuman punishment upon a child less than seventeen years old ...
>
> (3) Abuse of a child is a class C felony, unless:
>
> > ... (2) A child dies as a result of injuries sustained from conduct chargeable pursuant to the provisions of this section, in which case the crime is a class A felony.

As set forth in Instruction No. 10, this was the underlying felony that the jury found Mr. Bouser to have committed. The jury found Mr. Bouser committed this offense and J.M.P. died in perpetration of that felony, thus, pursuant to Instruction No. 11 they convicted him of second degree felony murder. "Abuse of a child" certainly qualifies as "any felony" as defined in the second degree felony-murder statute. We also note there is no requirement in the definition of "abuse of a child" that the abuse be dispensed over a period of time

---

**5.** Until 1984, Missouri's second degree murder statute had remained the same as written

in 1835 and as set forth *supra* in footnote 3.

**140**

before the charge will arise. *See Faraga v. State of Mississippi*, 514 So.2d 295 (Miss.1987).

■ Also, by way of the same 1984 amendments, with language that did not previously exist, § 565.021.2 specifically allows, "the punishment for second degree murder shall be in addition to the punishment for commission of a related felony or attempted felony, *other than murder or manslaughter.*" (Emphasis added.) "Statutory expression of one thing implies the exclusion of another." *State v. Rellihan*, 662 S.W.2d 535, 545 (Mo.App. W.D. 1983). Only murder or manslaughter would merge into the homicide for punishment purposes, no other felonies were expressly mentioned. Thus, the legislature specifically provided that punishment for a conviction of a felony will not merge into punishment for a second degree felony murder conviction supported by that same felony unless the underlying felony is murder or manslaughter. This alleviated the *Shock* court's concerns that, unless limited, the felony-murder rule would consume all other degrees of murder and manslaughter.

Convictions for both abuse of a child and felony murder have been upheld as not in violation of double jeopardy despite claims that the child abuse felony merged with the homicide. *See Coody*, 867 S.W.2d at 661.[6] It would appear counter-intuitive to hold that the felony child abuse cannot serve as a basis for the conviction of second degree felony murder under § 565.021.1(2).

The legislature, not the courts, makes law and it may limit or abolish the felony-murder rule as it sees fit. It is not for the courts to assume this legislative function. If the Missouri Legislature intends for felony assault or felony abuse of a child to merge into a resulting homicide, it may so formulate the second degree felony-murder statute. This court agrees with the reasoning of the Texas Court of Appeals on this same issue:

> If [the legislature] had intended to exempt [particular] felony offenses or lesser included felony offenses or to embrace the merger doctrine as a limitation on felony murder, it could easily have done so. The maxim "expresio unius est exclusio alterius" is often employed in the construction of statutes. In general, it means that a statute's inclusion of a specific limitation excludes all other limitations of that type. (Citations omitted.)

*Rodriguez v. Texas*, 953 S.W.2d 342, 354 (Tex.Ct.App.1997). For the same reason, this court declines to interpret the plain language of § 565.021.1(2) as barring a conviction of second degree felony murder based on the underlying felony of abuse of a child.

Thus, there was no error in the trial court's use of Instruction No. 10 and No. 11. The legislature did not intend for there to be any merger, and it is not within this court's province to rule contrary to our legislature's intent.

Point I is denied.

### Point II

In his second point on appeal, appellant contends the trial court abused its discretion when it refused to admit evidence he offered on the grounds it was irrelevant and inadmissible.

### "SOMEONE ELSE HAD THE OPPORTUNITY TO CAUSE THE INJURY" EVIDENCE

■ Trial courts are given broad discretion on questions of the relevance of evidence. Without clear showing of abuse of that discretion, appellate courts will not interfere with the trial court's ruling. *State v. Parkhurst*, 845 S.W.2d 31 (Mo. banc 1992).

---

6. The Southern District specifically declined to consider the current contention that "merger principles prohibit use of the felony-murder rule when abuse of a child is the underlying felony because that specific issue had not been properly raised on appeal." *Coody*, 867 S.W.2d at 663, n. 1.

To preserve for appeal the issue of improper exclusion of evidence, an offer of proof must be made at trial demonstrating to the trial judge why the evidence is relevant and should be admitted. *Evans v. Wal–Mart Stores, Inc.*, 976 S.W.2d 582, 584 (Mo.App. E.D.1998). An offer of proof at trial serves two purposes: (1) it "preserve[s] the record for appeal so the appellate court understands the scope and effect of the questions and proposed answers in considering whether the trial judge's ruling was proper," and (2) it allows "the trial judge to further consider the claim of admissibility" after having ruled the evidence inadmissible in pretrial hearings. *Id.* If a trial judge excludes evidence upon an offer of proof at trial, then the proponent may assert error on the exclusion. *Sullivan v. Spears*, 871 S.W.2d 75, 76 (Mo.App. W.D. 1994).

During his trial, Mr. Bouser properly made an offer of proof to the court concerning the testimony he sought to introduce. He now argues the trial court abused its discretion in thereafter excluding the evidence. Mr. Bouser maintains that the evidence elicited from Julie Hornbeck in the offer of proof, concerning the manner in which Ms. McMannama and Ms. Judkins (her mother and sister respectively) placed J.M.P.'s retainer in his mouth was:

> [R]elevant and admissible evidence that someone else had the opportunity to inflict one or more of the fatal injuries to [J.M.P.], because the evidence directly connected Ms. McMannama and Ms. Judkins to the source of the blunt force trauma that caused the laceration to [J.M.P.'s] liver.

In reviewing evidential relevance, we must "assume the party making an offer of proof stated it as fully and favorably as possible." *State v. Harris*, 620 S.W.2d 349, 353 (Mo. banc 1981). In Mr. Bouser's offer of proof, Ms. Hornbeck testified that J.M.P. wore a retainer that had to be taken out by Ms. McMannama and Ms. Judkins twice a day for cleaning. Ms. Hornbeck testified further:

> They had to hold him to take it out, so it would not go down his throat.... [They would restrain] his head, his arm, and his leg. And when they restrained his arms, they usually put the arm or the arm over the hand and stomach in order to restrain at all.... Every single time it seemed like they had to place their hand on his head, in order for him to stop moving around.... [If he didn't open his mouth], either Sherry or Krystal would stick their fingers in his mouth. Pry it open. They would literally open it up. He was always resisting. He didn't want it done.

Although she testified that this procedure to clean J.M.P.'s retainer was done daily, Ms. Hornbeck later stated that she had not personally seen Ms. McMannama and Ms. Judkins do this for at least two or three weeks before "the accident." After this definite and specific offer of proof, the trial court again ruled that the evidence was irrelevant and inadmissible. Consequently, the evidence would not be introduced to the jury.

"Evidence which has no other effect than to cast bare suspicion on another is not admissible." *State v. Schaal*, 806 S.W.2d 659, 669 (Mo. banc 1991). Evidence that another person or persons had an opportunity to commit the crime for which Mr. Bouser was on trial cannot be held admissible "absent proof that the other person committed an act *directly* connecting him or her with the crime." *State v. Magill*, 801 S.W.2d 725, 727 (Mo.App. S.D.1990).

Ms. Hornbeck testified that she had seen her mother and sister restrain J.M.P. in this manner "too many times to count." Again, she did not observe this "routine" less than two weeks before J.M.P. sustained the injuries that led to his death. No other evidence was offered to show a *direct* connection between this procedure for removing and replacing the retainer and the life-ending injuries J.M.P. sustained. No medical testimony was presented that tended to show that holding the child down in such a manner could

cause his liver to tear. Instead, the offered testimony tended to show that this was a daily event, and J.M.P., although resistant to the invasive procedure, had never been injured by it before. The medical testimony also controverted this assertion.

It cannot be determined whether the women removed, cleaned and replaced J.M.P.'s retainer within the "two days at most" timeframe of the infliction of injury upon J.M.P., nor can it be determined that this "routine" was of the type that would cause such a severe injury. Thus, neither Ms. McMannama nor Ms. Judkins can be *directly* connected to the blunt trauma or traumas leading to the death of J.M.P.

Moreover, the evidence demonstrated J.M.P. likely died from injuries that could only have been sustained within the time appellant was the only adult with J.M.P. Appellant argues that through his cross-examination, Ms. McMannama and Ms. Judkins "were caught in numerous lies," and "[i]f the defense had been permitted to link Ms. McMannama or Ms. Judkins to the injury that caused the laceration to [J.M.P.'s] liver, the outcome of the trial would have been different." However, no evidence was found in the court record that either woman "committed an act directly connecting her with the crime." The offered evidence would have merely cast bare suspicion upon the boy's mother and grandmother.

It is this court's duty to review the trial court's refusal to admit the evidence for abuse of discretion. The offered evidence was irrelevant because it did not sufficiently or directly connect some person other than Mr. Bouser with the crime. The trial court did not abuse its discretion in finding the evidence "irrelevant and inadmissible." [7]

Point II is denied.

7. Appellant alleges that the trial court's exclusion of this evidence violates his rights under the Fifth and Fourteenth Amendments to the United States Constitution and Art. I, Sec. 10 and Sec. 18(a), and Art. III, Sec. 40 of the Missouri Constitution. "However, we do not reach defendant's allegations of constitutional

## Conclusion

This court finds that the Missouri Legislature did not intend for the charges of felony murder and abuse of a child to merge nor do the facts support merger. Thus, the jury was properly instructed on second degree felony murder with the felony "abuse of a child" as the predicate felony. Further, the trial judge's refusal to admit evidence offered by appellant as "irrelevant and inadmissible" was not an abuse of discretion. We therefore affirm the trial court's judgment.

EDWIN H. SMITH, P.J., and TURNAGE, Sr.J., concur.

infirmity for, as noted above, the proffered testimony was inadmissible because of its facial irrelevance. We are therefore able to dispose of the contention on grounds other than the constitutional challenge." *Harris*, 620 S.W.2d at 358, n. 3.