

# In the Missouri Court of Appeals
# Eastern District

## DIVISION ONE

| | | |
|---|---|---|
| STATE OF MISSOURI, | ) | No. ED107425 |
| | ) | |
| Respondent, | ) | Appeal from the Circuit Court |
| | ) | of St. Louis County |
| vs. | ) | |
| | ) | Hon. John D. Warner, Jr. |
| VINCENT L. JONES, | ) | |
| | ) | Filed: |
| Appellant. | ) | February 25, 2020 |

Vincent Jones ("Defendant") appeals from the judgment entered on his convictions after a jury trial for abuse of a child resulting in death and second-degree felony-murder predicated on the child abuse. We affirm.

The sufficiency of the evidence is not in dispute. Defendant lived with his girlfriend ("Mom") and her four young children. On the morning of July 27, 2017, Mom left for work at approximately 7:20 a.m. When she left, her 21-month old son "Buddy" was sitting up in the bed where he had slept the night before with her and Defendant. He was whining and crying as he commonly did when Mom left. At 8:37 a.m., Defendant called 911 to report that Buddy was unresponsive and barely breathing. Buddy was taken to the emergency room, but died shortly thereafter at 11:00 a.m. The autopsy showed significant bruising over much of Buddy's 30-pound body: he had eight bruises above his right ear and three above his left ear; there were multiple bruises across his forehead; the back of his head was bruised, as was the inside and outside of his mouth; there were bruises covering

both thighs, on his sternum, abdomen and back. Buddy's abdomen was full of a large quantity of blood, much of which came from his torn liver and lacerated intestines. There was significant other internal damage as well, including to his pancreas, adrenal glands and diaphragm. He had massive bleeding around his testicles, in and around his brain and the spinal cord.

These injuries were caused by multiple instances of blunt force trauma, which was determined to be the cause of Buddy's death. The injuries all happened at the same time and could not have been inflicted more than two hours before Buddy died. He would have remained conscious for twenty or thirty minutes after being so severely beaten, during which time he would have been experiencing pain and crying. These injuries could not have been inflicted by Buddy's young siblings, nor caused by a fall or spanking; they were consistent with an adult punching this child with a fist or kicking him. In other words, the beating happened at the hands of an adult that morning. The only adult with Buddy after Mom left for work was Defendant. Defendant denied doing anything to hurt Buddy and claimed he did not know who beat him.

Buddy's brother, D.W., was interviewed at the Children's Advocacy Center the afternoon of Buddy's death. D.W. was five and half years old at the time. During the interview, while listing who he lived with, D.W. volunteered that Buddy was in the hospital because he was not breathing. When asked what happened to him, D.W. said he did not know. D.W. said that after Mom went to work he could hear Buddy crying in the other room "and [Defendant] keep on hitting him." Upon additional questions, D.W. explained that he did not see Defendant hitting Buddy, but did hear Defendant "thump" Buddy. D.W. said he heard Defendant tell Buddy to be quiet, but Buddy cried and cried "100 times."

After a pre-trial hearing pursuant to Section 491.075, the trial court determined that D.W.'s statements contained sufficient indicia of reliability such that the videotape of the interview could be admitted at trial.

At the close of evidence, the jury was instructed on abuse of child, second-degree felony-murder and involuntary manslaughter. The child abuse verdict-director instructed that if the jury found Defendant had knowingly caused injury to Buddy by beating him and Buddy died as a result of that injury, then it must find him guilty of child abuse. On the second-degree felony-murder count, the jury was instructed that if it found Defendant guilty of child abuse and Buddy was killed as a result of that child abuse, then it must find him guilty of murder in the second degree. The jury was also instructed that if it did not find Defendant guilty of second-degree murder, it must consider involuntary manslaughter. The jury found Defendant guilty of child abuse and second-degree murder. The court sentenced him as a prior and persistent offender to twenty years in prison on the child abuse causing death count and life imprisonment on the second-degree felony-murder count, to be served consecutively. This appeal follows.

In his first point on appeal, Defendant alleges the court erred by admitting the videotaped interview of five-year-old D.W., arguing that the statements made therein did not contain sufficient indicia of reliability and were not admissible under Section 491.075. We review a trial court's decision to admit a child's statements under Section 491.075 for abuse of discretion. *State v. Ragland*, 494 S.W.3d 613, 622–23 (Mo. App. E.D. 2016). We find no abuse of discretion here.

The out-of-court statements of a child are admissible in a criminal trial under Section 491.075.1 as substantive evidence to prove the truth of the matter asserted if,

among other things, the court finds after a hearing that "the time, content and circumstances of the statement provide sufficient indicia of reliability." Section 491.075.1(1). The reliability of a child's statement is determined by looking at the totality of the circumstances as set out in the evidence presented at the 491 hearing. *Id*. at 623. Several non-exclusive factors aid the analysis: (1) whether the statements were made spontaneously and consistently repeated; (2) the mental state of the child; (3) whether the child had a motive to fabricate; (4) whether the child's knowledge of the subject matter is unexpected at that age; (5) the amount of time between when the acts occurred and when the statements are made; and (6) the technique employed by the interviewer. *Id*. All of these factors are designed to assess whether the child "was particularly likely to be telling the truth when the statement was made." *Id*. Defendant argues D.W.'s statements were not sufficiently reliable based primarily on the first and second factors: D.W.'s mental state and inconsistencies during his interview.

As to D.W.'s mental state, the interviewer testified at the 491 hearing that D.W. seemed to understand her questions and his responses to her indicated his receptive language was developmentally normal for his age. She said D.W. was responsive to most of her questions, was polite and friendly and "very contained" for a five-year-old. The interviewer testified that D.W. stayed in his seat most of the time and kept on task for the almost 45-minute interview; when he occasionally deviated to play with the toys in the room, she said it was easy to bring him back on topic. Defendant asserts that the videotape belies this testimony and shows D.W. was focused more on playing with the toys in the interview room than on the questions. But, as the interviewer explained, young children need something to engage them during an interview because they are not able to just sit at

4

a table and have a conversation like an adult might. The mere fact that D.W. was playing with toys while answering questions does not demonstrate a lack of attention or understanding. Defendant also cites several examples of supposedly non-responsive answers from D.W., but young children do not always speak in the same linear and direct way as an adult might when answering questions. The mere fact that D.W. interspersed some of his answers with comments that were not directly responsive—either about the toys he was playing with or about a related but slightly different matter than the question addressed—does not indicate that he did not understand the question or was not paying sufficient attention. Even if he misunderstood or missed a few questions, overall D.W. was generally attentive and gave appropriately responsive answers. Defendant has not established that D.W.'s mental state shows that he was less likely to be telling the truth when he made these statements.

As to the spontaneity and consistency factor, Defendant concedes that D.W.'s statements about Defendant hitting Buddy were made spontaneously and does not claim that D.W. was ever inconsistent about this most salient fact. But he asserts that D.W. was "very inconsistent" about other matters, which he claims renders the entirety of the interview unreliable. Defendant points out that early in the interview when asked where Buddy was sleeping and where Buddy was when he was crying, D.W. said in Mom's room and that, at later points in the interview, when asked where Buddy was eating his breakfast or where he was sleeping or where he was crying, D.W. said Buddy was in D.W.'s room. But, as the interviewer explained at the 491 hearing, these statements are not necessarily inconsistent:

> A: I don't know if he was inconsistent or if I was just unclear. I was—I had a little bit of confusion, and I think he clarified it, [D.W.] sharing with

5

me about the sleeping arrangement. Because at one point, it sounded like he was saying the child was, his brother Buddy was, in Mom's bed. And then later he was saying Buddy was in his bed, in [D.W.'s] and his sister's bed. *And as I sought clarification of that, I thought it was an inconsistency, but it may, in fact, be that the child was moved.*

Q: So basically the location of Buddy at times changed?

A: Yes. And so I wasn't sure if his statement was changing or if this [victim's] actual location changed.

Q: And would that confusion pair with his inability to describe time at certain points?

A: I think the confusion was mine more than it was his. I think it was my confusion.[1]

In fact, D.W. expressly stated at one point in the interview that Buddy left one of the bedrooms and went into the other room. It was not inconsistent for D.W. to have stated that Buddy was crying and sleeping in both rooms at various points that morning. Defendant also points out that D.W. said his sister was asleep and then, shortly after, indicated they were all awake and that D.W. said he ate his waffles in his room and then immediately changed his answer to say he ate in the kitchen. In both of these instances, D.W. appears to be correcting himself, not giving inconsistent versions of the morning's events.[2] Defendant has failed to demonstrate that any of the supposed inconsistencies in D.W.'s statements indicate he was less likely to be telling the truth.

---

[1] Defendant suggests that the interviewer's confusion is itself an indication that the statements should not have been admitted under Section 491.075. We fail to see how this has anything to do with the ultimate issue on this point: whether the child was likely to be telling the truth. To the extent anything in this interview was unclear, that goes to the weight the jury was tasked with giving this evidence, not to its admissibility under Section 491.075.

[2] Defendant also argues that D.W.'s supposed inability to keep track of time called the reliability of his statements into question. He points to D.W.'s statement in the interview that Mom left for work when it was dark, which Defendant states was inconsistent with *the evidence at trial* showing she had actually left at 7:00 or 7:30 that summer morning when it was already light out. But when assessing the factors of reliability and whether the court abused its discretion in admitting this interview, we can consider *only* the evidence presented at the 491 hearing, not the evidence presented at trial. *See Ragland*, 494 S.W.3d 623.

Defendant's arguments regarding the other factors are also without merit. He acknowledges that the child had no motive to lie, but claims the child was motivated to please the interviewer and was suggestible, citing the time the child exclaimed "ta da" when he finished a drawing and the moment the child supposedly mimicked the interviewer saying "finally" right after she did when the air conditioning turned off. As the interviewer pointed out at the 491 hearing, it was not clear whether the child was mimicking her or was also just pleased that the air conditioning had "finally" turned off because he was also cold. Even if the child had a desire to please this interviewer, Defendant has failed to articulate how such a desire made it more likely that he was not telling the truth. In other words, there is no reason to believe the child was willing to lie about the events of the morning or anything else to please the interviewer. Defendant also points out that the interviewer admitted at the 491 hearing that she could have asked *one* of the questions during the interview in a more open-ended way. That a single question could have been phrased more artfully does not establish that the interviewer's techniques were problematic or undermined the reliability of D.W.'s statements.

Defendant has failed to show that the trial court abused its discretion in determining that D.W.'s statements were, under the totality of the circumstances, reliable and admissible under Section 491.075. Point I is denied.

In his remaining three points, Defendant argues that felony-murder cannot be predicated on child abuse resulting in death because that underlying felony is the act that itself caused the death. He contends that prosecution, conviction and sentencing for both of these crimes is prohibited by the felony-murder statute, the merger doctrine and his

7

constitutional right to be free from double jeopardy. None of these claims were raised in the trial court, and Defendant seeks plain error review. We find no error, plain or otherwise.

The felony-murder rule is traceable to the late 1790s and is premised on the idea that proving the defendant intended to commit a felony raises a conclusive presumption that he possessed the necessary intent to support a murder conviction for a death resulting from perpetration of that underlying felony. *See State v. Bouser*, 17 S.W.3d 130, 135 (Mo. App. W.D. 1999). At common law, there were no degrees of murder; all homicides were either murder or manslaughter. By the late 1800s, the legislature had codified and imposed different degrees of homicides and incorporated the felony-murder rule into the statutes. Thus, in 1878, the statute for first degree murder criminalized not only deliberate killings but also provided that "[e]very murder . . . committed in the perpetration or attempt to perpetrate any arson, rape, robbery, burglary or other felony, shall be deemed murder in the first degree." *Id*. at 135 (quoting Wagner's Stat. (1872) c. 42, art. 2, s.1, p. 445). "All other kinds of murder at common law" were murder in the second-degree, and there were separate provisions for manslaughter and justifiable homicide. *Id*. at 135, n.3 (quoting Wagner's Stat. (1872) c. 42, art. 2, s.2, p. 445). The Supreme Court of Missouri expressed concern that this first-degree felony-murder statute would consume all other degrees of homicide if there were not limits on the "other" felonies that could be used to predicate felony-murder. *State v. Shock*, 1878 WL 9686 at *4-5 (Mo. 1878). Thus, the Court construed "other felony" to mean "some collateral felony" and not to mean "acts of personal violence to the deceased" that were "necessary and constituent elements of the homicide itself, and are, therefore, merged in it." *Id*. at *5. This became known as the merger doctrine and it was applied sporadically over the years as the criminal statutes

8

evolved. *See Bouser*, 17 S.W.3d at 135-38 and *State v. Williams*, 24 S.W.3d 101, 109-15 (Mo. App. W.D. 2000) (discussing legislative history and development of merger doctrine since *Shock*).[3]

In 1984, the legislature removed felony-murder from the first-degree murder statute and rewrote the second-degree murder statute to its present form:

1.  A person commits the offense of murder in the second degree if he or she:

(1) Knowingly causes the death of another person or, with the purpose of causing serious physical injury to another person, causes the death of another person; or

(2) Commits or attempts to commit *any felony*, and, in the perpetration or the attempted perpetration of such felony or in the flight from the perpetration or attempted perpetration of such felony, another person is killed as a result of the perpetration or attempted perpetration of such felony or immediate flight from the perpetration of such felony or attempted perpetration of such felony.

2.  The offense of murder in the second degree is a class A felony, and the punishment for second degree murder shall be in addition to the punishment for commission of a related felony or attempted felony, *other than murder or manslaughter*.[4]

Section 565.021 (emphasis added).[5] It is widely-recognized that the plain and ordinary meaning of the phrase "any felony" in Section 575.021.1(2) is expansive and indicates the

---

[3] *Bouser* was handed down in December of 1999, but was not final due to pending motions for rehearing and transfer until May of 2000. Meanwhile, *Williams* was handed down in April of 2000 and, though certainly aware of its earlier decision in *Bouser*, the court does not mention it, presumably because it was not yet final.

[4] Because this section, Section 565.021.1(2), expressly permits cumulative punishment for all crimes other than murder or manslaughter, Defendant's double jeopardy argument necessarily fails and has been rejected by numerous courts as follows: Where, as here, the issue is multiple punishments imposed following a single trial, the double jeopardy analysis is "limited to determining whether multiple punishments were intended by the legislature." *State v. Barker*, 410 S.W.3d 225, 236 (Mo. App. W.D. 2013). "Inasmuch as our felony-murder statute expressly intends multiple punishments for both second degree felony murder and the underlying felony, such punishments when imposed in a single trial do not constitute double jeopardy." *Id*; *see also State v. Coody,* 867 S.W.2d 661, 664 (Mo. App. S.D. 1993); *State v. Mendoza,* 115 S.W.3d 873, 876 (Mo. App. W.D. 2003); *Johnson v. State*, 477 S.W.3d 2, 8 (Mo. App. E.D. 2015).

[5] Between its enactment in 1984 and today, there have been only minor changes to this statute and affecting the substantive language addressed here.

legislature's intent that *every* felony can serve as an underlying felony for purposes of felony-murder.  *See Bouser*, 17 S.W.3d at 138-39; *State v. Harding*, 528 S.W.3d 362, 368-69 (Mo. App. E.D. 2017); *State v. Tuttle*, 519 S.W.3d 443, 447-49 (Mo. App. S.D. 2016). If the legislature had wanted to exclude from the otherwise all-encompassing "any felony" language in Section 565.021.1(2) specific felonies or types of felonies—as it had done in prior iterations of the felony-murder rule in earlier versions of the statutes—it certainly could have used less expansive language than "any felony."  The only limitation on what felonies can predicate felony-murder—as the Western and Southern Districts have found— is set out in Section 565.021.2, which expressly permits the punishment for felony-murder to be cumulative to punishment for an underlying felony "other than murder or manslaughter."  *See Bouser*, 17 S.W.3d at 134-40; *see also Williams*, 24 S.W.3d at 109-15; *State v. Gheen*, 41 S.W.3d 598, 605 (Mo. App. W.D. 2001); *State v. Simino*, 397 S.W.3d 11, 25 (Mo. App. S.D. 2013), *abrogated on other grounds by State v. Sisco,* 458 S.W.3d 304 (Mo. banc 2015).  Relying on the statutory interpretation maxim *expressio unius est exclusio alterius* (expression of one thing implies the exclusion of another), those courts concluded that the express mention of a limitation on cumulative punishment for "murder" and "manslaughter" implied a legislative intent that there be no other limitations on which felonies can predicate felony-murder, including by way of applying the merger doctrine to exclude felonies that were themselves the very act that caused the death.  *See Williams*, 24 S.W.3d at 117.  The *Bouser* court found there was no longer a need for the merger doctrine because this express statutory exclusion of murder and manslaughter alleviated the *Shock* court's concern that the felony-murder rule might consume those other degrees of homicide.  *Bouser*, 17 S.W.3d at 140.

10

While there is no case in the Eastern District explicitly holding that the merger doctrine is no longer viable under the current statute, we have acknowledged that "modern precedent" such as *Williams* "suggests that the merger doctrine has been abrogated." *State v. Gray*, 347 S.W.3d 490, 508 (Mo. App. E.D. 2011). We did not have occasion to address the viability of the doctrine in *Gray* because it was a conventional second-degree murder case to which the merger doctrine did not apply. *Id*. The issue is squarely before us now. We find the Western and Southern Districts' analyses well-reasoned and persuasive and conclude that the merger doctrine is no longer viable under the current felony-murder statute.[6] The language of that statute indicates the legislative intent to allow *every felony except murder or manslaughter* to serve as a predicate for felony-murder.

Defendant argues that "murder or manslaughter" ought to be construed more liberally in his favor to include all homicides. He reasons that because murder and manslaughter were the only homicides at the time Section 565.021 was enacted in 1984, the reference to "murder" and "manslaughter" was intended to refer to all homicides. Defendant points out that, although in 1984 the child abuse statute did not contemplate the death of the child and therefore did not constitute a homicide, since 1997 the crime of child abuse rises to a class A felony when the abuse causes death. *See* Section 568.060.5(2). Defendant argues that child abuse causing death and all other crimes that include death as an element should be treated like the homicides of "murder" and "manslaughter" for

---

[6] Defendant suggests that we need not follow these other districts' cases and can instead continue to rely on the Supreme Court's opinion in *Shock* because it was not overturned by those intermediate appellate courts and is still "good law" providing authority for the merger doctrine. He also contends that our Eastern District opinion in *State v. Hanes*, 729 S.W.2d 612 (Mo. App. E.D. 1987), also never overturned, likewise supports continued application of the merger doctrine in this district. We disagree. *Hanes* involved a crime committed *before* the 1984 amendments to the felony-murder statute, and thus like *Shock*, was decided in a totally different legal context under very different criminal statutes. These outdated cases are of little value to our discussion here, particularly given that we have available to us a much more instructive analysis of the merger doctrine under the current statutory scheme in the Western and Southern District cases.

purposes of the felony-murder statute. To construe the statute otherwise, Defendant contends, renders the prohibition on cumulative punishment in Section 565.021.2 meaningless because the State can simply premise felony-murder on a crime that is not *in name* "murder" or "manslaughter" but *in reality* is the type of homicidal crime the legislature intended not to be cumulatively punished. Defendant claims that his case illustrates the problem: Assuming he is guilty of causing Buddy's death, then Defendant is in reality guilty of some degree or type of either murder or manslaughter because the death was either caused knowingly with deliberation (murder in the first degree), knowingly without deliberation (conventional murder in the second degree), recklessly (involuntary manslaughter in the first degree) or with criminal negligence (involuntary manslaughter in the second degree). *See generally* Sections 565.020 to 565.027. None of those crimes can serve as the underlying felony for felony-murder. But the State can side-step that limitation by charging the crime as child abuse causing death, which it can use to predicate felony-murder, subjecting Defendant to cumulative punishments he would not otherwise have faced if the crime was charged as a murder or manslaughter. Defendant argues that under this scenario the felony-murder rule swallows the legislature's gradation system for homicides, which is the very harm the merger doctrine sought to address. Contrary to *Bouser's* conclusion, he asserts, the statute does not alleviate this concern unless we construe the language "murder or manslaughter" to mean "all homicides" or continue applying the merger doctrine so that the State cannot predicate felony-murder on a felony that is itself the very act causing death.

Whatever merit there may be to the policies underlying Defendant's argument for imposing these limitations on the types of felonies that can predicate felony-murder—lest

12

the felon-murder rule be stretched beyond its logical bounds—we are simply not at liberty to apply any such limitation on felony-murder that is not already written in the statute. *See Williams,* 24 S.W.3d 117. "The legislature, not the courts, makes law and it may limit or abolish the felony-murder rule as it sees fit. It is not for the courts to assume this legislative function." *Bouser*, 17 S.W.3d at 140. If in 1984 the legislature did, as Defendant contends, mean to refer in Section 565.021.2 generally to all homicides, then surely it would have used the general term "homicides" and not the terms "murder" and "manslaughter" that refer to particular homicides. If the legislature had at any point thereafter wanted to include additional homicides, it could have done so. But it has not, even after the child abuse statute was amended to include a death element and after the courts held that child abuse causing death is a permissible predicate felony under the statutory language. *See Bouser*, 17 S.W.3d at 139-40; *see also Mendoza*, 115 S.W.3d at 875 n.3. We are obligated to follow the statute as it is written. The statute as written indicates that the legislature intended every felony to qualify as a predicate to felony-murder and did not intend for there to be any merger or other limitation except for the specific crimes of murder and manslaughter. "[I]t is not within this court's province to rule contrary to our legislature's intent." *Bouser,* 17 S.W.3d at 140.

In sum, abuse of a child resulting in death is a felony and it is not "murder" or "manslaughter." Therefore, it is a felony on which felony-murder may be predicated under Section 565.021, and punishment for felony-murder may be imposed in addition to the punishment for child abuse without violating that statute or the double jeopardy clause. The court did not err, plainly or otherwise, in instructing the jury to find felony-murder based on the predicate crime of child abuse causing death, in entering the conviction for

felony-murder or in sentencing Defendant for that crime in addition to the child abuse sentence. Points II, III and IV are denied.

The judgment is affirmed.


ROBERT G. DOWD, JR., Judge

Robert M. Clayton III, P.J. and
Roy L. Richter, J., concur.

14