**STATE of Missouri, Respondent,**

v.

**Paul Bruce DUDLEY, Jr., Appellant.**

**No. WD 69970.**

Missouri Court of Appeals,
Western District.

Feb. 23, 2010.

S. Kate Webber, Esq., Kansas City, MO, for appellant.

Shaun J. Mackelprang, Esq., and Dora A. Fichter, Esq., Jefferson City, MO, for respondent.

Before: LISA WHITE HARDWICK, P.J., and JAMES M. SMART and ALOK AHUJA, JJ.

ALOK AHUJA, Judge.

Paul B. Dudley appeals his conviction after a jury trial of second-degree felony murder and unlawful use of a weapon. Dudley makes two claims: first, that he was subjected to double jeopardy when he was convicted of, and separately punished for, both felony murder and unlawful use of a weapon; and second, that he was denied his right to confront the witnesses against him when a Deputy Medical Examiner testified to her opinions as to the cause and circumstances of the victim's death based on the results of an autopsy performed by another, absent medical examiner. We affirm.

## Factual Background

On October 28, 2006, Paul B. Dudley fired several shots from a .22–caliber rifle toward a group of people standing in the front yard of a home two houses away from him. One of the bullets struck Linda McDaniel in the head. Ms. McDaniel later died from the gunshot wound.

Dudley testified at trial to several incidents prior to October 28, 2006, in which a guest or visitor at the victim's home had allegedly shot at Dudley and his girlfriend. Dudley testified that on the night of Ms. McDaniel's killing, he "had words" with an individual at her home; Dudley testified that he believed this individual was armed with a gun and would start shooting. Dudley claimed that, in an effort to protect himself, he retrieved the rifle, held it over his head, and fired into the air toward Ms. McDaniel's residence.

Ms. McDaniel's autopsy was performed by Dr. Thomas Gill, a Deputy Medical Examiner for Jackson County. At the time of trial, Dr. Gill was no longer employed by Jackson County. He did not testify at Dudley's trial, nor was his autopsy report admitted into evidence. Instead, Dr. Laura Knight, who was then a Jackson County Deputy Medical Examiner, testified at trial as to her opinions drawn from a review of the autopsy file, including the autopsy report, the death certificate, diagrams and photographs. Dr. Knight was not involved in the performance of Ms. McDaniel's autopsy.

Following a four-day trial, the jury convicted Dudley of unlawful use of a weapon and second-degree felony murder. The trial court sentenced him to twenty-three years for felony murder and four years for unlawful use of a weapon, with the sentences to run concurrently to one another. Dudley appeals.

## Analysis

### I.

■ "[O]ur review of the lower court's denial of [defendant's] double jeopardy claim is *de novo.*" *State v. White*, 931 S.W.2d 825, 828 (Mo.App. W.D.1996). Likewise, "[s]tatutory interpretation is a question of law, and questions of law are reviewed *de novo.*" *Goodwin v. Carroll County*, 250 S.W.3d 427, 428 (Mo.App. W.D.2008).

■ "Where multiple punishments are imposed following a single trial, double jeopardy analysis is limited to determining whether multiple punishments were intended by the legislature." *State v. Sanchez*, 186 S.W.3d 260, 266–67 (Mo. banc 2006); *see also, e.g., State v. Harris*, 243 S.W.3d 508, 511 (Mo.App. W.D.2008). "[C]umulative punishments may be imposed in a single trial if the legislature has made clear that it intended the sentences to be cumulative." *State v. Dravenstott*, 138 S.W.3d 186, 190 (Mo.App. W.D.2004) (citations and internal quotation marks omitted).

We therefore begin our analysis with the text of the statutes under which Dudley was convicted. The felony murder statute provides in relevant part:

1. A person commits the crime of murder in the second degree if he:

. . . .

(2) Commits or attempts to commit any felony, and, in the perpetration or attempted perpetration of such felony or in the flight from the perpetration or attempted perpetration of such felony, another person is killed as a result of the perpetration or attempted perpetration of such felony or immediate flight from the perpetration of such felony or attempted perpetration of such felony.

2. Murder in the second degree is a class A felony, and the punishment for second degree murder shall be in addition to the punishment for commission of a related felony or attempted felony, other than murder or manslaughter.

§ 565.021.[1] As relevant here, the unlawful use of a weapon statute provides that:

A person commits the crime of unlawful use of weapons if he or she knowingly:

. . . .

(4) Exhibits, in the presence of one or more persons, any weapon readily capable of lethal use in an angry or threatening manner[.]

§ 571.030.1.

■ "[S]ection 565.021.1(2), the felony murder statute, specifically authorizes cumulative punishment with any related felony other than murder or manslaughter." *State v. Mendoza*, 115 S.W.3d 873, 876 (Mo.App. W.D.2003). " 'A standard rule of statutory construction is that the express mention of one thing implies the exclusion of another.' " *Andrews v. State*, 282 S.W.3d 372, 379 (Mo.App. W.D.2009) (citation omitted). Thus, the express prohibition on cumulating the punishment for second-degree felony murder with the punishment for murder or manslaughter indicates that cumulative punishment for felony murder and other underlying felonies is authorized. Because unlawful use of a weapon is not one of the offenses for which cumulative punishment is expressly prohibited, the legislature intended that it be punished "in addition to" or cumulatively with the punishment for felony murder, where a death ensues in connection with the unlawful use of a weapon. Accordingly, such cumulative punishment does not violate the protection against double jeopardy. *Mendoza*, 115 S.W.3d

---

**1.** Statutory citations refer to the Revised Statutes of Missouri 2000.

at 876 ("Inasmuch as our felony-murder statute 'expressly intends multiple punishments for both second degree felony murder and the underlying felony, such punishments when imposed in a single trial do not constitute double jeopardy.'" (quoting *State v. Owens,* 849 S.W.2d 581, 584 (Mo.App. W.D.1993))).

In support of his double jeopardy argument, Dudley relies on *State v. Cook,* 560 S.W.2d 299 (Mo.App.1977). *Cook* held that a felony murder conviction could not be based on commission of the same underlying felony at issue here, because "[e]xhibiting the revolver in a rude, angry and threatening manner in the presence of the victim in the instant case was of such a fleeting nature that it was a distinct part of and inseparably related to the overall physical act required to perpetrate the homicide," and the two offenses thus "constituted a single indivisible transaction." *Id.* at 304. In reaching this conclusion, *Cook* applied the "merger" doctrine, which is "a judicially-created means of limiting or barring the application of the felony-murder rule whenever the act causing the homicide is 'indivisible from the act providing the basis for the underlying felony.'" *State v. Kohser,* 46 S.W.3d 108, 114 (Mo. App. S.D.2001) (citation omitted). More recent decisions have held, however, that "the merger doctrine, under the current Missouri statutory scheme, is no longer a viable theory." *State v. Gheen,* 41 S.W.3d 598, 604–05 (Mo.App. W.D.2001). These cases find that two features of the current felony murder statute demonstrate a legislative intent that the commission of any felony (other than murder or manslaughter) can support a felony murder conviction, thus superseding the "merger" doctrine: first, § 565.021.1(2) refers to a death associated with the commission or attempted commission of *"any* felony"; and second, § 565.021.2 provides that the punishment for felony murder "shall be in

addition to the punishment for commission of a related felony or attempted felony, *other than murder or manslaughter." Id.* (citing *State v. Bouser,* 17 S.W.3d 130, 139–40 (Mo.App. W.D.1999), and *State v. Williams,* 24 S.W.3d 101, 117 (Mo.App. W.D.2000)).

Dudley argues that, although the judge-made "merger" doctrine may no longer prevent his punishment for both felony murder and unlawful use of a weapon, such cumulative punishment is nevertheless prohibited by § 556.041. That statute, titled "Limitation on conviction for multiple offenses," provides in relevant part:

> When the same conduct of a person may establish the commission of more than one offense he may be prosecuted for each such offense. He may not, however, be convicted of more than one offense if
>
> . . . .
>
> (4) The offense is defined as a continuing course of conduct and the person's course of conduct was uninterrupted, unless the law provides that specific periods of such conduct constitute separate offenses.

Section 556.041 only states a general, "default" rule, however. If the specific statute under which a defendant is convicted directly addresses the permissibility of cumulative punishments, that specific statute controls over the general directives of § 556.041.

> In determining whether the Missouri legislature intended cumulative punishments, ... we first look to the statute under which Defendant was charged and convicted. If that statute is silent, then we look to the general cumulative punishment statute, Section 556.041.

*State v. Barber,* 37 S.W.3d 400, 403 (Mo. App. E.D.2001) (citation omitted); *see also State v. Bledsoe,* 178 S.W.3d 648, 654 n. 3

(Mo.App. W.D.2005) ("*Barber* directs that we need only look to section 556.041, the general cumulative punishment statute, if the statute under which Defendant was charged and convicted is silent as to whether our legislature intended cumulative punishments.").

As we have explained, the felony murder statute is *not* silent concerning the permissibility of cumulative punishments. Instead, that statute affirmatively states that the punishment for felony murder shall be "in addition to" the punishment for any underlying felony, except murder and manslaughter. Given that § 565.021 directly addresses the issue, Dudley cannot rely on § 556.041(4) to prevent the imposition of cumulative punishments for his convictions for felony murder and unlawful use of a weapon.[2]

## II.

In his second Point, Dudley argues that his rights under the Confrontation Clause were violated when Dr. Laura Knight testified about the cause and circumstances of Ms. McDaniel's death, based on the results of an autopsy performed by Dr. Thomas Gill.

Whether a criminal defendant's rights under the Confrontation Clause were violated by the admission of evidence is a question of law that this Court reviews *de novo*. *State v. March*, 216 S.W.3d 663, 664–65 (Mo. banc 2007).

On a number of occasions this Court has addressed whether, in the wake of *Crawford v. Washington*, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004), a medical examiner other than the one who performed an autopsy may testify to the results of the autopsy, or to opinions which rely on the results of the autopsy, and whether an autopsy report prepared by an absent medical examiner may itself be admitted into evidence. *See State v. Martin*, 291 S.W.3d 269, 283–88 (Mo.App. S.D. 2009); *State v. Haslett*, 283 S.W.3d 769, 778 (Mo.App. S.D.2009); *State v. Walkup*, 290 S.W.3d 764, 767–68 (Mo.App. W.D. 2009); *State v. Bell*, 274 S.W.3d 592, 595–96 (Mo.App. W.D.2009); *State v. Davidson*, 242 S.W.3d 409, 417–18 (Mo.App. E.D. 2007).

We need not revisit these issues here, however, because even if Dudley's rights under the Confrontation Clause were violated by Dr. Knight's testimony, any error in the admission of her testimony was harmless, and cannot justify a new trial.

Confrontation Clause violations are subject to the harmless error test found in *Chapman v. California*, 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). That test requires that the error be harmless beyond a reasonable doubt, meaning that there is no reasonable doubt that the error's admission failed to contribute to the jury's verdict.

*March*, 216 S.W.3d at 667 (citations omitted); *see also State v. Justus*, 205 S.W.3d 872, 881 (Mo. banc 2006).

Dr. Knight's testimony was limited, and did not address matters which Dudley disputed. Her direct testimony occupies just ten pages of the trial transcript. Five of those pages address general matters such as her qualifications, general autopsy procedures, and the materials she reviewed to formulate her opinions. In the remaining five pages, Dr. Knight identified photographs taken of Ms. McDaniel's wounds and testified to her opinion that Ms. McDaniel died of a gunshot wound to the

---

**2.** Based on our disposition we need not decide whether unlawful use of a weapon under § 571.030.1(4) is an offense which is "defined as a continuing course of conduct" within the meaning of § 556.041(4).

head, fired from a distance. Dudley conceded at trial, however, that Ms. McDaniel died due to a gunshot he fired from two houses away from where Ms. McDaniel was standing. Since Dudley did not dispute that Ms. McDaniel was killed by a gunshot which he fired from a distance, he could not have been prejudiced by the opinions Dr. Knight expressed. *See State v. Martin,* 291 S.W.3d at 287–88 (declining to decide merits of Confrontation Clause argument, where any error in admission of autopsy report of absent medical examiner, and related testimony, was harmless because defendant did not dispute cause of victim's death); *State v. Bell,* 274 S.W.3d at 596 (error in admission of testimony concerning conclusions drawn by absent medical examiner was harmless where neither victim's cause of death, nor the fact that victim was shot from a distance, were disputed at trial); *State v. Davidson,* 242 S.W.3d at 418 (erroneous admission of autopsy report harmless where cause of victim's death undisputed).

Dudley argues that he was prejudiced because Dr. Knight's testimony concerning the angle of the gunshot that killed Ms. McDaniel was inconsistent with his claim that he fired the rifle *into the air* in self-defense. But Dr. Knight did not take a position as to the angle of the bullet; instead, she repeatedly stated that she could not express an opinion about the bullet's trajectory because of a lack of sufficient information in the materials she had reviewed. Thus, in her direct examination, she testified:

Q. Is there any angle that is determined from the report? Is it up, down, straight across, or what can you tell from that?

A. Well, Dr. Gill didn't mention an up or down angle and so I can't. I can't assume that it was just straight across, but that may have been what he meant.

On cross-examination, Dr. Knight acknowledged that her opinions, and the autopsy report, did not contradict Dudley's claim that he had fired into the air (and therefore that Ms. McDaniel was hit with a bullet traveling downward).

Q. [F]rom [Dr. Gill's] report you read that there was one gunshot wound to the head and you said earlier it traveled from back to front and left to right, but you can't determine what specific angle the bullet traveled, correct?

. . . .

A. That's right. It would be really difficult to tell.

Q. Okay. Would one way to determine the direction or the angle that the bullet was traveling in be to take an internal photograph?

A. Yes.

. . . .

Q. Thank you. And did Dr. Gill, the doctor who performed the autopsy, take any internal photographs of Ms. McDaniel?

A. No, he didn't.

Q. Could the fact that the bullet did enter from the right and was found at the left and you said it traveled from front to back, could that be consistent with a shot that was fired and hit Ms. McDaniel while traveling downward?

. . . .

A. Really, I'm not certain whether it was traveling upward or downward. I can't. I can't tell without seeing it directly myself.

On redirect, Dr. Knight explained that "numerous factors" would affect a determination of the fatal shot's trajectory, including the victim's position in relation to the firearm at the time of the gunshot, and that she did not have information available to her to make that determination.

In its closing arguments the prosecution urged the jury to reject Dudley's claim that he was shooting into the air. Notably, however, it made this argument based on the testimony of fact witnesses; the prosecution made no reference to Dr. Knight's testimony in either its initial or rebuttal closing arguments. Dudley's counsel, on the other hand, stressed that the State had failed to present evidence to disprove his theory that the fatal shot was traveling downward:

> There's no evidence that he wasn't firing up in the air like he said. You heard about the bullet wound to Linda McDaniel's head. The thing is we don't know if it came at a downward angle. We can't tell. They didn't take the pictures. We don't know that.

Indeed, although Dudley's counsel vehemently challenged the testimony of the State's fact witnesses, particularly as to the presence of guns or drugs at Ms. McDaniel's residence, she went out of her way to state that she did not dispute Dr. Knight's testimony:

> Everyone that the State brought in to testify about what happened, and we're talking *aside from the medical examiners who there's no issue with, we're not debating that,* the people who got up here to actually prove to you what happened that night, the people they presented to prove to you that this was not self-defense, every one of them got up here and they told you there are no drugs and there are no guns.

In an attempt to identify prejudice, Dudley argues that "it is not clear beyond a reasonable doubt that a jury would not have concluded that Mr. Dudley acted in self-defense *if Dr. Gill were to testify and to be cross-examined about the angle of the bullet.*" This argument does not purport to identify any prejudice flowing from *Dr. Knight's* testimony at trial; instead, Dudley argues that prejudice flows from his speculation as to what *Dr. Gill* may have testified, if he had been called, and if he had remembered details of Ms. McDaniel's autopsy beyond those reflected in the autopsy file.

Dudley's argument cannot defeat a finding of harmless error. In order to find an error harmless, "we must find that no reasonable doubt exists that *the admitted evidence* failed to contribute to the jury's verdict." *State v. Davidson*, 242 S.W.3d at 417 (emphasis added); *see also Chapman v. California*, 386 U.S. 18, 23, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967) (" 'The question is whether there is a reasonable probability that *the evidence complained of* might have contributed to the conviction.' " (emphasis added, citation omitted)). The focus of the harmless-error inquiry, in this context, must accordingly be on the testimony that was actually given at the defendant's trial. Here, Dr. Knight testified that she was unable to determine the angle at which the fatal shot was fired, based on the available information from the autopsy. As Dudley's counsel argued in closing, her testimony was in no way inconsistent with his claim that he had fired into the air. Dr. Knight's limited, uncontroversial testimony was harmless beyond any reasonable doubt. Speculation that Dr. Gill may have provided additional support for Dudley's defense, if he had been called to testify, cannot establish prejudice from the testimony of a different witness, who expressed no opinion one way or the other on the relevant point.

### Conclusion

We affirm Dudley's convictions for second-degree felony murder and unauthorized use of a weapon.

All concur.