STATE of Missouri, Respondent,

v.

**Javier BARKER, Appellant.**

**No. WD 73856.**

Missouri Court of Appeals, Western District.

July 30, 2013.

Motion for Rehearing and/or Transfer to Supreme Court Denied Aug. 27, 2013.

Application for Transfer Denied Oct. 29, 2013.

Daniel N. McPherson, for respondent.

Cheryl A. Pilate, for appellant.

Before Division Three: VICTOR C. HOWARD, Presiding Judge, JOSEPH M. ELLIS, Judge and ANTHONY REX GABBERT, Judge.

JOSEPH M. ELLIS, Judge.

Appellant Javier Barker appeals from his conviction of one count of murder in the second degree (felony murder), § 565.021, and one count of abuse of a child resulting in death, § 568.060. For the following reasons, the judgment of conviction is affirmed.

The evidence viewed in the light most favorable to the verdict reflects the following. On December 26, 2008, Appellant arrived at the home of his girlfriend, Casey Pence, in Pleasant Hill, Missouri. Pence was scheduled to work that evening from 10:00 PM until 6:00 AM at a nearby nursing home and rehabilitation facility. Appellant agreed to watch Pence's two children, D.B., who was three years old, and J.B., who was five years old, while Pence was at work. When Pence left for work, D.B. was active and had no visible injuries to his head or face. Pence's time card reflects that she arrived for work at approximately 10:35 PM and left work at 6:02 AM. None of her coworkers saw her leave the facility during her scheduled shift.

After arriving home from work on December 27, 2008, Pence went into J.B. and D.B.'s bedroom to check on them. She noticed what she believed to be chocolate around D.B.'s mouth and went in to clean it off his face. Upon doing so, Pence realized that D.B. was unresponsive and that his eye was swollen and bruised. D.B. was transported by ambulance to the hospital. On December 28, 2008, D.B. was pronounced dead after it was determined he was legally brain dead. An autopsy later revealed D.B. suffered from several skull fractures and retinal hemorrhaging. D.B. also sustained a fracture above his right ankle and had multiple areas of bruising on his back.

After D.B. was transported to the hospital, a Pleasant Hill police officer drove Pence and J.B. to Pence's mother's home. While in the patrol car, a conversation between Pence and J.B. was recorded on the police officer's dash camera. During that conversation, J.B. stated that Appellant was playing video games with him and D.B. when Appellant told D.B. to go to bed. J.B. then stated D.B. "went to bed and then he just got up." J.B. further explained that when D.B. went to bed, he and Appellant watched a movie until he fell asleep on the couch. J.B. also stated that Appellant kept checking on D.B. "to see if he was asleep." The conversation between J.B. and Pence lasted only a few minutes.

Later that day, J.B. was interviewed by Sergeant Todd Burris at the Pleasant Hill Police Department. Sgt. Burris had not

been trained on how to interview children; nor did he have any previous experience with interviewing children. A portion of Sgt. Burris's interview with J.B. was recorded. During the recorded portion of the interview, Sgt. Burris asked J.B. "[l]et me get this right. [Appellant] spanked [D.B] a whole bunch of times last night? Right. But you didn't see him, you just heard him, right, but [Appellant] said he didn't." J.B. responded, "Yes." Sgt. Burris then asked J.B. if he knew what a lie was and told him it was very important because when "someone tells you something, sometimes they are not telling you the truth." J.B. responded that he believed Appellant was lying when Appellant said he did not spank D.B. Later in the interview, Sgt. Burris asked J.B. if Appellant stepped on D.B. J.B. stated that Appellant stepped on D.B.'s leg. Sgt. Burris then asked J.B. to demonstrate how Appellant stepped on D.B. using a stuffed police bear. Sgt. Burris further demonstrated "stomping" for J.B. At the conclusion of the interview, Sgt. Burris gave J.B. three stuffed police bears, a Hot Wheels car, a bike helmet, and a fake police badge.

On December 29, 2008, J.B. was taken to the Child Protection Center ("CPC") where forensic interviewer Kristin Le'Nae Gilmore conducted an interview ("the CPC interview") with J.B. The CPC interview was videotaped. During the interview, J.B. originally stated that he did not know what happened to D.B. J.B. later explained that Appellant stepped on D.B.'s foot and then demonstrated for Gilmore how Appellant did it by stomping on the floor. He went on to state that Appellant waved his hand for J.B. to get away from the bedroom after Appellant stepped on D.B.'s foot. J.B. then explained that he went back into the living room and heard Appellant spanking D.B. more than one time. J.B. also stated that they

watched the Dark [Kn]ight [movie], and [D.B] was getting tired and then when like he got tired like he went to his room, but then he had one more chance to watch the Dark Knight and he went to sleep then he woke up whenever [Appellant] carried him. And that's all that happened to [D.B.].

In response to Gilmore's question as to why D.B. got spanked, J.B. responded D.B. "did nothing wrong . . . he was just crying to[o] much."

On February 20, 2009, Appellant was charged by indictment with one count of second-degree felony murder and one count of abuse of child resulting in death. Appellant maintained his innocence, denying any involvement in D.B.'s death. Police officers noted that Appellant smelled of alcohol when they arrived at the Pence home on the morning of the incident as well as when he was being interrogated at the police station later that morning. An empty bottle of whiskey was recovered from the Pence home.

Prior to trial, the State sought to admit J.B.'s statements to Sgt. Burris and the CPC interview. Appellant challenged the admission of J.B.'s out-of-court statements as well as J.B.'s competency as a witness. The trial court conducted a hearing on the matter at which several individuals testified. The evidence presented at the hearing will be discussed *infra*, as necessary.

Following the hearing, the trial court determined that J.B. was competent to testify and that the CPC interview was admissible under § 491.075. J.B's statements to Sgt. Burris, however, were excluded by the trial court, which found that the statements lacked "sufficient indicia of reliability to permit their admission." More specifically, the trial court determined that "Sergeant Burris had no training as to the interviewing of child witnesses" and that "many of the questions

posed by Burris to J.B. were leading and suggestive." The trial court further found that "[r]ather than waiting for J.B. to introduce a subject or utilize a specific term, Burris introduced facts or circumstances during the interview and introduced and utilized words or terms with the minor child." Thus, the trial court determined J.B.'s statements to Sgt. Burris were inadmissible under § 491.075.

In February 2011, Appellant's trial commenced. J.B. testified at trial, and his CPC interview with Gilmore was admitted into evidence and played before the jury. The State also introduced medical testimony at trial that indicated that D.B. died as a result of blunt force trauma to the head consistent with abuse. The medical experts further opined that it was unlikely that J.B., a then five-year-old weighing 44lbs., could inflict the injuries sustained by D.B.

Ultimately, the jury convicted Appellant of second-degree murder and abuse of a child resulting in death. The trial court entered its judgment accordingly and sentenced Appellant to a thirty-year term of imprisonment for the second-degree murder count to run consecutive to a twenty-five-year term of imprisonment for the abuse of a child resulting in death count. The trial court subsequently denied Appellant's motion for new trial. Appellant now raises five points of error on appeal.

In his first point, Appellant contends that the trial court abused its discretion by permitting J.B. to testify at trial. Appellant avers that Sgt. Burris's suggestive questioning tainted J.B.'s memory of the events and, thus, made J.B. incompetent to testify. "A child's competency is within trial court's discretion, and the court's decision will not be reviewed in absence of clear abuse of discretion."

*Jones v. State*, 197 S.W.3d 227, 234 (Mo. App. W.D.2006).

Section 491.060(2) [1] provides that a child under the age of ten is incompetent to testify if the child "appears incapable of receiving just impressions of the facts respecting which the child is examined, or of relating them truly." Section 491.060(2), therefore, "creates a rebuttable presumption that persons under the age of ten are incompetent to testify." *State v. Brown*, 902 S.W.2d 278, 286 (Mo. banc 1995). The presumption of incompetency can be rebutted, however, by showing that the child has:

(1) a present understanding of, or the ability to understand upon instruction, the obligation to speak the truth; (2) the capacity to observe the occurrence about which testimony is being sought; (3) the capacity to remember the occurrence about which testimony is sought; and (4) the capacity to translate the occurrence into words.

*Id.* (internal quotation omitted). Thus, the presumption of incompetency is deemed rebutted " 'if the child [witness] appears to the trial judge to have the capacity both to receive just impressions and to relate them truthfully.' " *State v. Bass*, 81 S.W.3d 595, 604 (Mo.App. W.D.2002) (quoting *State v. Williams*, 729 S.W.2d 197, 199 (Mo. banc 1987)).

Here, the trial court determined that J.B. was competent to testify "from the totality of the evidence presented" at the competency hearing. Specifically, the trial court found that "J.B. has expressed an understanding of the difference between a truth and a lie" and can "differentiate between a truth and a lie in words suitable [for] a child." The trial court went on to conclude that

1. All statutory citations are to RSMo 2000 unless otherwise indicated.

J.B. has demonstrated that he had the mental capacity at the time of the alleged homicide to observe and register the occurrence; J.B. has a memory sufficient to retain an independent recollection of what he saw on the night of the occurrence; and has the ability, albeit in child like terms rather than adult terms, to articulate into words his memory of events.

Thus, the trial court found that J.B. had the capacity to both receive just impressions and relate them truthfully at trial.

The evidence presented at the competency hearing supports the trial court's findings. During his testimony at the hearing, J.B. correctly identified which examples given by the prosecutor were lies and which were truths. He later testified that "[i]t's important to tell the truth" and promised to tell the truth when answering questions at the hearing. On cross-examination, J.B. testified that the truth is "[s]omething that is really happening" and that a lie was "something that didn't happen." J.B.'s testimony therefore, indicated, that J.B. knew the difference between a truth and a lie, albeit in child-like terms, and, although he could not articulate exactly why it is important to tell the truth, he understood that it is important to do so. Thus, J.B. demonstrated that he had the ability to understand the concept of telling the truth when testifying.

 While Appellant does not concede that J.B. understood the necessity of telling the truth on the witness stand, Appellant's main contention regarding J.B.'s competency to testify stems from his belief that Sgt. Burris's interview tainted J.B.'s memory of the incident. Appellant contends that "the uncontroverted evidence showed that J.B.'s memory . . . was unreliable and was likely irreparably corrupted by the effects of the Burris interview." In support of his contention, Appellant relies upon the testimony of his expert witness, Dr. Terrance Campbell, a forensic psychologist. Specifically, Dr. Campbell opined at the hearing that he believed J.B.'s memory of the events was likely affected by Sgt. Burris suggestive questioning and also by rumors or conversations J.B. might have heard from people familiar with the situation.

The trial court, however, was not required to find J.B. incompetent based solely on Dr. Campbell's opinion that J.B.'s memory was tainted. *See State v. Johnston*, 979 S.W.2d 461, 463 (Mo.App. W.D. 1998) (explaining that "[t]he trial court's § 491.075 determination was not mandated by the [defense expert's] opinion" that "the interviews [of the child victim] were irretrievably contaminated"). Moreover, during cross-examination, Dr. Campbell admitted that he could only speculate as to whether Sgt. Burris asked J.B. leading and suggestive questions during the portion of the interview that was not taped. Dr. Campbell further testified that he could not be sure as to whether J.B. was affected, or even heard, any rumors regarding what happened to D.B. Thus, Dr. Campbell's testimony indicates he could not be certain as to the effects of outside sources on J.B.'s memory.

Furthermore, the trial court stated that it based its opinion that J.B. was competent to testify on the totality of the evidence presented at trial. Appellant's position that Sgt. Burris's interview tainted J.B.'s memory was made abundantly clear to the trial court at the hearing, and the trial court noted Dr. Campbell's opinion that J.B.'s statements were not reliable due to Sgt. Burris's interview in its judgment. Thus, despite Appellant's contentions, the record reflects that the trial court was aware of and considered the possible effects of Sgt. Burris's interview

in determining whether J.B. was a competent witness.

Additionally, J.B.'s testimony at the hearing demonstrated his capacity to remember and articulate the events about which his testimony was being sought. When asked about the night of the incident, J.B. testified that Appellant was watching him and D.B. while his mom (Pence) was at work. He explained that Appellant played videogames and watched movies with them. He further testified that D.B. fell asleep and that Appellant put D.B. to bed, but D.B. got up again. Such testimony is consistent with the account of events J.B. told Pence during their conversation in the patrol car, which occurred prior to his interview with Burris, and, thus, establishes J.B.'s ability to recall the events that occurred the night D.B. was injured.

Accordingly, based upon J.B.'s testimony and the evidence presented at the hearing, we cannot say that the trial court abused its discretion by finding J.B. competent to testify.[2] Point denied.

■ In his second point, Appellant contends that the trial court abused its discretion by finding J.B.'s CPC interview admissible pursuant to § 491.075. Appellant asserts that the State failed to prove that J.B.'s statements during the CPC interview were reliable and not tainted by Sgt. Burris's suggestive questioning. We review a trial court's decision to admit or exclude a child's out-of-court statements following a § 491.075 hearing for abuse of discretion. *State v. Wadlow*, 370 S.W.3d 315, 320 (Mo.App. S.D.2012).

■ Section 491.075 provides that out-of-court statements made by a child under the age of fourteen that are "not otherwise admissible by statute or court rule" are admissible as substantive evidence in criminal proceedings if "[t]he court finds, in a hearing conducted outside the presence of the jury that the time, content and circumstances of the statement provide sufficient indicia of reliability" and the child "testifies at the proceedings." For purposes of § 491.075, courts determine the reliability of a child's out-of-court statements by evaluating the totality of the circumstances. *Wadlow*, 370 S.W.3d at 320. In evaluating the totality of the circumstances, the court considers a non-exclusive list of factors, including: "(1) spontaneity and consistent repetition; (2) the mental state of the declarant; (3) the lack of motive to fabricate; and (4) knowledge of subject matter unexpected of a child of similar age." *Id.* (internal quotation omitted). "Interviewing techniques are also an important factor to be considered as part of the court's totality

---

**2.** We further note that Appellant cites to two Missouri cases for the proposition that Missouri courts have recognized that child witnesses are susceptible to suggestive interview techniques: *State v. Sloan*, 912 S.W.2d 592, 596 (Mo.App. E.D.1995), and *State v. Foust*, 920 S.W.2d 949, 955 (Mo.App. E.D.1996). Interestingly enough, neither *Sloan* nor *Foust* indicated that the complained of suggestive interview techniques or questioning affected the child witnesses' competency to testify. Rather, in both cases, the Eastern District found that the trial court had erred by excluding testimony or questioning regarding suggestive interview techniques and whether the child witnesses may have been subjected to such techniques or questioning. *See Sloan*, 912 S.W.2d at 597 (finding the trial court erred in prohibiting the defense's expert witnesses from testifying about suggestive interview techniques used by the detectives when questioning the victim); *Foust*, 920 S.W.2d at 954 (finding the trial court erred by preventing the defendant from questioning a child witness about how her stepmother questioned her about the alleged abuse because such questioning did not constitute hearsay, as it was not being offered for the truth of the matter, but rather to establish how the witness perceived what her stepmother said and if that affected her allegations of abuse).

of the circumstances analysis." *N.J.K. v. Juvenile Officer*, 139 S.W.3d 250, 258 (Mo. App. W.D.2004).

Appellant attacks the reliability of J.B.'s CPC interview on the basis that Gilmore was not informed about J.B.'s interview with Sgt. Burris and, therefore, could not ask questions during the interview that would separate what J.B. actually perceived the night D.B. was injured from what he heard during the interview with Sgt. Burris. Appellant points to instances during the CPC interview that he alleges are examples of J.B. mimicking or parroting the suggestive and leading phrases he heard Sgt. Burris use. In particular, Appellant points out that J.B. mimicked Sgt. Burris's stomping and that J.B. explained he knew D.B. had a "crimpled back" because the police officer told him D.B. did.

However, based upon our review of the record, including the transcript of J.B.'s CPC interview and his interview with Sgt. Burris, we cannot say that the trial court abused its discretion in finding that J.B.'s CPC interview bore the requisite indicia of reliability. As the trial court noted in its judgment, Gilmore was "a highly trained and experienced forensic interviewer," "[t]he interview was conducted in a neutral environment," and "Gilmore asked open ended and non-suggestive questions." And while Gilmore testified that suggestive or leading questions can influence a child's memory of how an event occurred and that it would have been helpful to know that Sgt. Burris had interviewed J.B., Gilmore did not testify that Sgt. Burris's interview completely tainted or invalidated her interview with J.B.

Furthermore, as the trial court found, J.B.'s responses during the interview were spontaneous and consistent. When Gilmore asked J.B. about D.B., J.B. volunteered that D.B. had to go to the hospital. When asked why D.B. had to go to the hospital, J.B. explained how his mom (Pence) came home from work and discovered that D.B. was not breathing. When asked to explain what happened the night D.B. was injured, J.B. stated that Appellant, D.B., and himself were playing videogames when D.B. fell asleep. He then explained that Appellant told D.B. to go to bed, but D.B. woke up, and Appellant gave him "one more chance." J.B. further explained that D.B. fell asleep again and that he and Appellant fell asleep watching *The Dark Knight* once D.B. was put to bed. Such statements were consistent with J.B.'s conversation with Pence in patrol car prior to his interview with Sgt. Burris. Thus, while Appellant focuses exclusively on portions of the CPC interview he believes are the result of Burris's suggestive questioning, there are equal portions of the CPC interview that demonstrate J.B.'s independent and consistent memory of the events that occurred the night D.B. was injured.

Additionally, the trial court clearly stated that it considered "the potential impact the Burris interview may have had on the CPC interview." Nevertheless, the trial court found it significant that two days had passed between the Burris interview and when the CPC interview occurred and concluded that, based on the totality of the circumstances, the CPC interview should still be admitted at trial. Given the trial court's analysis, we cannot say that it abused its discretion in finding J.B.'s CPC interview admissible at trial pursuant to § 491.075. Point denied.

■ In his third point, Appellant contends that the trial court erred by failing to *sua sponte* declare a mistrial or, alternatively, failing to issue a curative instruction based on statements made by the State during its closing argument that allegedly shifted the burden of proof and persuasion to him, as the defendant. Dur-

ing its closing argument, the State made several comments regarding what it anticipated Appellant's defense would be—that either Pence or J.B. was responsible for D.B.'s injuries and subsequent death. In particular, Appellant takes issue with the following two statements:

> So then the question becomes, who did it. You know what our theory is. You know why we are here and you will here [sic] some other argument about how this could have occurred and who could have inflicted those injuries. You will hear that i[t] was his mother, Casey Pence.

Immediately following this statement, Appellant objected on the basis that it impermissibly shifted the burden of proof to the defendant. The trial court sustained the objection. The prosecutor then continued:

> If it were suggested to you that Casey Pence killed [D.B.], again, in order for that to be proven beyond a reasonable doubt, it has to be proven based on reason and common sense.

Appellant made no objection following this statement. In fact, at no point during the State's closing argument did Appellant request a mistrial, or, alternatively, a curative instruction, on the burden of proof issue. Instead, Appellant raised the issue of whether Appellant was entitled to a mistrial as a result of the State's closing argument for the first time in his motion for new trial.

■■■ Accordingly, based upon the record, Appellant failed to properly preserve this point of error for appellate review. "In order to preserve for appellate review a complaint about improper jury argument, a defendant must object at the time the argument is made"; otherwise, any claim that the argument was erroneous is waived. *State v. Lingle*, 140 S.W.3d 178, 190 (Mo.App. S.D.2004). Likewise, "[r]aising an issue for the first time in a motion

for new trial, when an objection could have been made at trial, is insufficient to preserve the claimed error for appellate review." *State v. Goeman*, 386 S.W.3d 873, 881 (Mo.App. S.D.2012). Thus, by failing to request a mistrial at the time the argument was made and, instead, raising the claim for the first time in his motion for new trial, Appellant failed to properly preserve the issue for our review. *See State v. Durham*, 371 S.W.3d 30, 37 (Mo.App. E.D.2012) (explaining that it must review the appellant's claim that the trial court failed to declare a mistrial for plain error because the appellant did not request a mistrial at the time he objected to the prosecutor's argument and, instead, waited until the conclusion of the State's argument to make his request for a mistrial).

■■■ Thus, our review of Appellant's claim that the trial court failed to *sua sponte* declare a mistrial or issue a curative instruction is limited to plain error. "Under plain error review, a conviction will be reversed for improper closing argument only when it is established that the argument had a decisive effect on the outcome of the trial and amounts to manifest injustice." *State v. Morrison*, 364 S.W.3d 779, 789 (Mo.App. W.D.2012) (internal quotation omitted). "An argument has a decisive effect when it is reasonably probable that, absent the argument, the verdict would have been different." *Id.* at 788 (internal quotation omitted). "Statements made in closing argument rarely constitute plain error." *Id.* (internal quotation omitted).

■■■ Furthermore, it must be noted that courts are especially hesitant "to find plain error in the context of closing argument because the decision to object is often a matter of trial strategy, and in the absence of objection and request for relief, the trial court's options are narrowed to

uninvited interference with summation and a corresponding increase of error by such intervention." *State v. Edwards,* 116 S.W.3d 511, 536 (Mo. banc 2003) (internal quotation omitted). "Trial judges are not expected to assist counsel in trying cases, and trial judges should act *sua sponte* only in exceptional circumstances." *State v. Thompson,* 390 S.W.3d 171, 176 (Mo.App. E.D.2012). Thus, "a trial court's decision not to grant a mistrial *sua sponte* will not be reversed as plain error absent a clear showing of a manifest abuse of discretion, which resulted in manifest injustice or a miscarriage of justice." *State v. Carr,* 50 S.W.3d 848, 856 (Mo.App. W.D.2001).

■■■ Appellant contends that he was extremely prejudiced by the State's comments because it lead the jury to believe that for Appellant to prove his innocence, he had to prove that someone else committed the crime beyond a reasonable doubt. However, "the prejudicial effect of the comment[s] must be viewed in context and in light of the proper definition given in the instructions." *Edwards,* 116 S.W.3d at 537. The jury was clearly instructed by the trial court as to the proper burden of proof. Moreover, during his closing argument, Appellant's defense counsel reminded the jury "[t]he presumption of innocence places upon the State the burden of proof beyond a reasonable doubt that [Appellant] is guilty" and that burden of proof never shifts. Thus, we cannot say that the State's brief, isolated comments that Appellant perceives impermissibly shifted the burden of proof had a decisive effect on the jury's verdict. Accordingly, we find the trial court did not plainly err in failing to *sua sponte* declare a mistrial or issue a curative instruction as a result of the closing arguments made by the State. Point denied.

■■■ In his fourth point, Appellant contends that the trial court erred by failing to dismiss the charge of abuse of a child resulting in death because the elements of the offense of abuse of a child resulting in death involve the same criminal elements as the charge of second-degree felony murder against him. More specifically, Appellant contends that the two offenses of second-degree felony murder and abuse of a child resulting in death should have been merged under the merger doctrine.

The merger doctrine is a doctrine derived from common law that originated as "a means of limiting or barring application of the felony-murder rule when the act causing the homicide is indivisible from the act providing the basis for the underlying felony." *State v. Williams,* 24 S.W.3d 101, 109 (Mo.App. W.D.2000) (internal quotation omitted). Missouri courts recognized the merger doctrine as early as 1878. *See State v. Shock,* 68 Mo. 552 (1878). Nevertheless, Missouri courts' more recent decisions have clearly held that " 'the merger doctrine, under the current Missouri statutory scheme, is no longer a viable theory.' " *State v. Dudley,* 303 S.W.3d 203, 206 (Mo.App. W.D.2010) (quoting *State v. Gheen,* 41 S.W.3d 598, 604–05 (Mo.App. W.D.2001)); *see also Williams,* 24 S.W.3d at 117.

Appellant concedes in his brief that Missouri courts no longer recognize the merger doctrine as a viable theory. Nonetheless, Appellant requests we reevaluate the validity of the merger doctrine in light of the fact that several other jurisdictions with similar second-degree felony murder statutes still apply the merger doctrine. However, given this Court's prior holdings regarding the invalidity of the merger doctrine and Appellant's inability to cite to any binding authority on this Court to the contrary, we decline Appellant's invitation to revisit the issue of whether the merger doctrine is still valid under Missouri law.

■ Moreover, to the extent that Appellant contends his convictions for both second-degree murder and abuse of a child resulting in death violate his constitutional right to be free from double jeopardy, such contention is without merit. "The Double Jeopardy Clause of the Fifth Amendment to the United States Constitution, made applicable to the states by the Fourteenth Amendment, prevents a criminal defendant from being subjected to multiple punishments for the same offense." *State v. Thompson*, 361 S.W.3d 46, 50 (Mo.App. W.D.2011) (internal quotation omitted). "Preventing multiple punishments for the same offense is intended to ensure that the courts' sentencing discretion remains within the confined limits established by the legislature." *Id.* Thus, "[w]here multiple punishments are imposed following a single trial, [our] double jeopardy analysis is limited to determining whether multiple punishments were intended by the legislature." *Dudley*, 303 S.W.3d at 207 (internal quotation omitted).

In *State v. Coody*, 867 S.W.2d 661, 664 (Mo.App. S.D.1993), the defendant contended that the trial court violated his constitutional right to be free from double jeopardy by entering judgment and sentence against him for both abuse of a child and second-degree felony murder because the alleged act of abuse "merged" into the homicide itself. In rejecting the defendant's argument, the court explained that:

> When our legislature rewrote Missouri's felony-murder rule in 1984, it was with the explicit expression of intention that punishment for the felony murder shall be in addition to the punishment for commission of a related felony or attempted felony, other than murder or manslaughter. Inasmuch as our felony-murder statute expressly intends multiple punishments for both second degree felony murder and the underlying felony, such punishments when imposed in a single trial do not constitute double jeopardy.

*Id.* at 666 (internal quotations and citations omitted). Thus, the court found that the legislature intended cumulative punishments for the felony-murder and any related felonious offense as long as the related felony was not murder or manslaughter. *Id.* The court, therefore, ultimately concluded that the defendant's constitutional right against double jeopardy was not violated when the trial court entered convictions against him for both second-degree felony murder and abuse of a child. *Id.*

In reliance upon the Southern District's analysis in *Coody*, this Court, in *State v. Mendoza*, 115 S.W.3d 873, 876 (Mo.App. W.D.2003), likewise held that a court entering convictions for both second-degree murder and abuse of a child does not violate a defendant's right to be free from double jeopardy. In *Mendoza*, the defendant averred that his double jeopardy rights were violated because he was twice punished for the same offense in that child abuse is a lesser included offense of second-degree felony murder. *Id.* at 875. In rejecting the defendant's argument, we emphasized the Southern District's reasoning in *Coody* that the legislature intended cumulative punishments for both the felony-murder and the related felony, unless the related felony was murder or manslaughter, when it enacted the current second-degree felony murder statute. *Id.* at 876. Thus, we concluded that the trial court had the power to enter convictions against the defendant for both second-degree felony murder and abuse of a child. *Id.*

Accordingly, based upon this Court's prior precedent in *Mendoza*, Appellant's right to be free from double jeopardy was not violated when the trial court entered convictions against him for both second-

degree felony murder and abuse of a child resulting in death.[3] Point denied.

■■■ In his fifth point, Appellant contends that the trial court erred in entering judgments of conviction against him because the State failed to present sufficient evidence to prove him guilty beyond a reasonable doubt of second-degree felony murder and abuse of a child resulting in death. Our "review of the sufficiency of the evidence is limited to whether the State has introduced sufficient evidence for any reasonable juror to have been convinced of the defendant's guilt beyond a reasonable doubt." *State v. Nash*, 339 S.W.3d 500, 508–09 (Mo. banc 2011). This court "accepts as true all of the evidence favorable to the state, including all favorable inferences drawn from the evidence and disregards all evidence and inferences to the contrary." *State v. Bateman*, 318 S.W.3d 681, 687 (Mo. banc 2010) (internal quotation omitted). "The jury, not the appellate court, is responsible for weighing the reliability and credibility of the witnesses." *State v. Motley*, 56 S.W.3d 482, 483 (Mo.App. S.D.2001) (internal quotation omitted). Thus, "the relevant question is whether, after the viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Bateman*, 318 S.W.3d at 687.

Appellant asserts that there was an extreme lack of evidence to support his convictions because merely being D.B.'s caregiver on the night in question is insufficient to sustain a criminal conviction and there was sufficient evidence that demonstrated reasonable doubt as to his involvement in D.B.'s death. Such argument, however, is without merit, as Appellant fails to view the evidence and all reasonable inferences therefrom in the light most favorable to the prosecution.

Appellant was charged and convicted of second-degree felony murder on the basis that he committed the class A felony of abuse of a child resulting in death. Section 565.021 provides that a person commits second-degree murder when he "[c]ommits or attempts to commit any felony, and, in the perpetration or the attempted perpetration of such felony ... another person is killed as a result of the perpetration or attempted perpetration of such felony." Section 568.060.1 provides that "[a] person commits the crime of abuse of a child if such person ... [k]nowingly inflicts cruel and inhuman punishment upon a child less than seventeen years old." Such crime constitutes a class A felony when "[a] child dies as a result of injuries sustained from conduct chargeable pursuant to" § 568.060. § 568.060.3(2).

The evidence, viewed in the light most favorable to the verdict, reflects the following. D.B. was three years old on December 26, 2008. Pence testified that D.B. was active and injury-free when she left for work at 10:30 PM. Pence's coworkers testified that Pence did not leave the nursing home facilities during her scheduled shift. D.B. was left in the care of Appellant, who drank at least three glasses of straight whiskey while watching D.B. J.B.

---

**3.** Although not raised by the parties, we recognize that sections 556.041(1) and (3) prohibit simultaneous convictions of two offenses where "[o]ne offense is included in the other," or where "[t]he offenses differ only in that one is defined to prohibit a designated course of conduct generally and the other to prohibit a specific instance of such conduct."

It may be that one or both of these provisions could be implicated in this case. In *Dudley*, however, we held that "[s]ection 556.041 only states a general, 'default' rule," which is inapplicable to felony murder prosecutions because the issue of cumulative punishments is specifically addressed by § 565.021.2. 303 S.W.3d at 207–08.

testified that Appellant checked on D.B. several times throughout the night because D.B. was crying. J.B. further testified that he believed D.B. was crying because Appellant was spanking D.B. J.B. also testified that he saw Appellant step on D.B.'s foot.

Dr. John Somerauer and Dr. Michael Handler testified that D.B.'s injuries were consistent with abuse and that the cause of D.B.'s death was blunt force trauma to the head. Both doctors further testified that it was unlikely that J.B., a then five-year-old boy weighing 44lbs., could not have caused the injuries D.B. sustained. Additional evidence was presented that D.B. sustained an injury that left a ring above his left ear. Dr. Handler testified that a whiskey bottle could have caused such injury. Testimony indicated that Appellant had received a bottle of whiskey as a Christmas present, and an empty whiskey bottle was recovered from the refrigerator freezer. A print recovered from the freezer door was identified as Appellant's.

Given such evidence, a juror could reasonably conclude that Appellant knowingly inflicted cruel and inhuman punishment upon D.B., who was less than seventeen years old, that resulted in D.B.'s death. Accordingly, there was sufficient evidence from which a jury could reasonably find Appellant guilty, beyond a reasonable doubt, of second-degree felony murder and abuse of a child resulting in death. Point denied.

Judgment affirmed.

All concur.