

# Missouri Court of Appeals

## Southern District

### Division One

STATE OF MISSOURI,         )
                                )
        Plaintiff-Respondent,    )
                                )
v.                           )      No. SD34254
                                )      Filed:  November 30, 2016
JUSTIN DION TUTTLE,       )
                                )
        Defendant-Appellant.    )

### APPEAL FROM THE CIRCUIT COURT OF JASPER COUNTY

Honorable Charles D. Curless, Special Judge

**<u>AFFIRMED</u>**

Justin Tuttle (Defendant) was convicted after a jury trial of second-degree felony murder and armed criminal action (ACA).  *See* §§ 565.021, 571.015.[1]  Defendant's single point on appeal contends the trial court plainly erred in submitting an instruction for second-degree felony murder based on second-degree assault because such submission was prohibited by the "merger doctrine."  Finding no merit to this contention, we affirm.

---

[1] All statutory references are to RSMo (2000).  All rule references are to Missouri Court Rules (2016).

A second amended information charged Defendant with first-degree murder and ACA for assaulting and killing Daniel Martin, Jr. (Victim). *See* §§ 565.020, 571.015. The information also gave notice that the State would submit "murder in the second degree felony under Section 565.021.1(2)," based on the death of Victim "as a result of the perpetration of the class C felony of assault in the second degree under Section 565.060.1(2)[.]" After Defendant was found guilty of the felony-murder charge and ACA, he was sentenced to consecutive terms of life imprisonment for second-degree felony murder and 15 years for ACA.[2]

Defendant does not challenge the sufficiency of the evidence to support his convictions. "This Court reviews the evidence in the light most favorable to the jury's verdict." *State v. Celis-Garcia*, 344 S.W.3d 150, 152 (Mo. banc 2011). So viewed, the following evidence was adduced at trial.

On the morning of September 26, 2013, Victim and his girlfriend, Annmarie Patrick (Patrick), were looking to "get some meth." Victim and Patrick were driving in Victim's pickup truck when they saw Defendant and Daniel Compton (Compton) walking down the road. Victim and Defendant knew each other. Victim and Defendant had gone to school

---

[2] In addition to the charges of murder and ACA (Counts 1 and 2) outlined above, Defendant also was charged, as a prior and persistent offender, with five additional counts: the class D felony of tampering with physical evidence for concealing Victim's body (Count 3); tampering with physical evidence for concealing a pickup truck (Count 4); the class D felony of abandonment of a corpse (Count 5); the class C felony of first-degree tampering for unlawfully operating the truck (Count 6); and the class C felony of stealing the truck (Count 7). Pursuant to a plea agreement, the State agreed to dismiss Counts 4, 5 and 7 in exchange for guilty pleas to Counts 3 and 6. With respect to Counts 3 and 6, Defendant was sentenced to seven years and 15 years, respectively. Those terms are to run consecutively to each other, but concurrently with Count 1.

together and had been "getting high" together for 10 years. Patrick and Defendant had previously had sex, but Victim was not aware that had happened.

Victim asked Defendant "if he could find any meth." Defendant said he "might be able to." Victim drove Defendant and Compton to a house and dropped them off. Victim and Patrick then went to find some money. After obtaining $50, Victim and Patrick met Defendant and Compton. The plan was for Compton to get the methamphetamine and then meet Victim, Defendant and Patrick later at Jones Trading Post Road, which was near a local swimming hole.

Victim, Defendant and Patrick went to Jones Trading Post and swam for 10 to 15 minutes. Patrick went to the truck to change her clothes. Defendant came up to the truck and told Patrick, "something's going to happen, but don't freak out." Defendant went back to where Victim was.

Patrick was digging through her stuff to find some clothes when she heard someone yell. Patrick turned around and saw Victim holding his head. Victim and Defendant started fighting and wrestling, and they eventually rolled into the water.[3] Defendant "pulled [his] knife" and stabbed Victim. Victim screamed for Patrick to get help. Patrick jumped in the water to try to pull Victim out from underneath Defendant, but Victim "was already dead by the time [she] got in the water." Defendant told Patrick to give him a big rock, which she did. Defendant "put it underneath [Victim's] shirt and sunk him right there in four foot of water."

---

[3] Defendant testified that the fight began when Victim asked Defendant if he had had sex with Patrick, and Defendant answered, "fuck you, everybody has, you know."

3

Defendant and Patrick got into Victim's truck and left. Defendant told Compton that he and Victim "got into it[,]" Defendant "knocked a couple of holes in [Victim]" and Victim ran off. Defendant and Patrick told friends that Victim had "run off to Nixa with some girl." Victim's body was found three days later floating in the lake near Jones Trading Post Road.

A forensic pathologist conducted Victim's autopsy and observed various injuries. Victim had defensive wounds on his hands. Victim had a laceration on the back of his head about "three fourths of an inch long" and "a half inch deep." The laceration was the result of blunt force trauma. Victim also had several incised wounds "as a result of sharp force injury." Victim had incised wounds on his upper right back, the middle of his back, his left cheek, above his left collarbone, the right side of his chest, the left side of his chest and below the breastbone. These wounds were consistent with being stabbed by a knife or other sharp instrument. The wound on the left side of Victim's chest was lethal because "it went between the ribs" and the "left lung was cut." The wound below the breastbone was "potentially lethal, because it went in and hit the liver and caused – would have caused bleeding from there." The cause of death was determined to be "[i]nsufficient oxygen going to the brain as a result of decreased oxygen in the blood, because of the injury to the lung[.]" The manner of death was determined to be homicide.

Defendant testified on his own behalf. Defendant took responsibility for all the wounds on Victim's body, but claimed he acted in self-defense.

The jury instructions submitted by the State included Instruction No. 10, the verdict director for second-degree murder as a result of perpetration of second-degree assault, and Instruction No. 11, hypothesizing second-degree assault. At the instruction conference, the

4

trial court asked defense counsel if she had an objection to any of the instructions submitted by the State, and counsel responded, "No, Your Honor." Both instructions were read to the jury. In Defendant's motion for new trial, he did not raise a claim of instructional error. This appeal followed.

## Standard of Review

"In order to assign the giving of an instruction as error, Rule 28.03 requires a defendant to both make a specific objection during trial and raise the issue in his motion for new trial." *State v. Cooper*, 215 S.W.3d 123, 125 (Mo. banc 2007). Because Defendant failed to preserve his claim of instructional error, we only review for plain error. *See State v. Zetina-Torres*, 482 S.W.3d 801, 810 (Mo. banc 2016); *State v. Wurtzberger*, 40 S.W.3d 893, 897-98 (Mo. banc 2001); *State v. Myles*, 479 S.W.3d 649, 656-57 (Mo. App. 2015); *State v. Manuel*, 443 S.W.3d 669, 672 (Mo. App. 2014); *State v. Merrick*, 257 S.W.3d 676, 680 (Mo. App. 2008). For instructional error to rise to the level of plain error, a defendant must demonstrate that the trial court "so misdirected or failed to instruct the jury that manifest injustice or miscarriage of justice has resulted." *Zetina–Torres*, 482 S.W.3d at 810; *see Cooper*, 215 S.W.3d at 125.

## Discussion and Decision

Defendant's single point contends the trial court plainly erred in submitting Instruction No. 10, the felony murder director, and Instruction No. 11, defining second-degree assault. These instructions are set forth below.

## INSTRUCTION NO. 10

As to Count I, if you do not find the defendant guilty of murder in the second degree as submitted in Instruction Number 8, you must consider whether he is guilty of murder in the second degree under this instruction.

As to Count I, if you find and believe from the evidence beyond a reasonable doubt:

First, that defendant committed assault in the second degree, as submitted in Instruction No. 11, and

Second, defendant caused the death of [Victim], by stabbing him, and

Third, that [Victim] was killed as a result of the perpetration of that assault in the second degree,

then you will find the defendant guilty under Count I of murder in the second degree.

However, unless you find and believe from the evidence beyond a reasonable doubt each and all of these propositions, you must find the defendant not guilty of murder in the second degree under this instruction, but you must then consider whether he is guilty of voluntary manslaughter under Instruction No. 13.

**INSTRUCTION NO. 11**

If you find and believe from the evidence beyond a reasonable doubt:

First, that on or about September 26, 2013, in the County of Stone, State of Missouri, the defendant knowingly caused physical injury to [Victim] by means of a dangerous instrument by stabbing him, and

Second, that defendant did not act in lawful self-defense as submitted in Instruction No. 24,

then you will find that the defendant has committed assault in the second degree.

However, unless you find and believe from the evidence beyond a reasonable doubt each and all of these propositions, you cannot find that the defendant has committed assault in the second degree.

Defendant argues that because "the alleged second-degree assault was the act causing the murder," submission of second-degree felony murder based upon second-degree assault was prohibited by the "merger doctrine." We disagree.

6

In Missouri, a person can commit second-degree murder in one of two ways: (1) knowingly, or with the purpose of causing serious physical injury, causing the death of another; or (2) committing felony murder. *See* § 565.021.1. A person commits felony murder if he:

> Commits or attempts to commit *any felony*, and, in the perpetration or the attempted perpetration of such felony or in the flight from the perpetration or attempted perpetration of such felony, another person is killed as a result of the perpetration or attempted perpetration of such felony or immediate flight from the perpetration of such felony or attempted perpetration of such felony.

§ 565.021.1(2) (emphasis added). In addition, the penalty provision of the statute provides that "[m]urder in the second degree is a class A felony, and the punishment for second degree murder shall be in addition to the punishment for commission of a related felony or attempted felony, *other than murder or manslaughter*." § 565.021.2 (emphasis added).

"The felony-murder rule permits the felonious intent necessary to a murder conviction to be shown by the perpetration of or attempt to perpetrate a felony." ***State v. Bouser***, 17 S.W.3d 130, 135 (Mo. App. 1999) (internal quotation marks omitted). The merger doctrine, initially a judicial creation, is a means of limiting or barring application of the felony-murder rule when the underlying felony is the very act that caused the homicide. *Id*.; *see **State v. Williams***, 24 S.W.3d 101, 109-11 (Mo. App. 2000) (explaining that the merger doctrine applies to merge the underlying felony into the homicide when the underlying felony is the same act that was alleged to have caused victim's death). Since its inception in 1878, "[o]nly a few cases have embraced the merger doctrine." ***State v. Gheen***, 41 S.W.3d 598, 604 (Mo. App. 2001); *see **Williams***, 24 S.W.3d at 111-13.

In ***Williams***, the western district of this Court effectively concluded the merger doctrine was no longer viable in Missouri because it was precluded by the second-degree

7

murder statute and the definition of felony murder. *Williams*, 24 S.W.3d at 114-17; *see* § 565.021.1(2) (felony murder committed if a person commits or attempts to commit "any felony" and another person is killed as a result). Initially, the Court determined that by giving the "any felony" language of the statute its plain and ordinary meaning, "any" felony means "every" felony. *Williams*, 24 S.W.3d at 115. The Court also focused on the penalty provision of the statute. *See* § 565.021.2 (punishment for second-degree murder shall be in addition to the punishment for commission of a related felony or attempted felony, "other than murder or manslaughter"). The Court concluded that "our legislature excluded murder and manslaughter as predicate felonies for felony murder and, in doing so, intended that no other limitations be placed on the offense of felony murder, which would include limitation by way of the merger doctrine." *Williams*, 24 S.W.3d at 117.

Recently, this Court relied on *Williams* in rejecting an argument similar to that of Defendant here in *State v. Simino*, 397 S.W.3d 11, 24 (Mo. App. 2013).[4] In *Simino*, the defendant was charged with felony murder based on the underlying felony of domestic assault. *Id*. at 18-19. As in the case at bar, the defendant was not charged with the assault, and the jury only determined whether the defendant committed assault in order to decide whether he committed felony murder. *Id*. at 19. The defendant argued that the submission of the felony-murder verdict director and the instruction defining domestic assault violated the merger doctrine. *Id*. at 24. This Court disagreed, holding that, "[t]he express language of the felony-murder statute abrogated the common law doctrine of merger, and we 'are obligated to enforce the felony-murder statute as written, without limiting its application

---

[4] *Simino* was abrogated on other grounds by *State v. Sisco*, 458 S.W.3d 304 (Mo. banc 2015).

8

by the [merger] doctrine.'" *Id*. at 25 (quoting *Williams*, 24 S.W.3d at 117). This Court explained:

> In *Williams*, the Western District reviewed the cases involving the "merger doctrine," the felony-murder rule, and statutory history. 24 S.W.3d at 109-17. The Western District concluded that the legislature intended "no other limitations be placed on the offense of felony murder, which would include limitation by way of the merger doctrine." *Id.* at 117 (noting the legislature excluded murder and manslaughter as predicate felonies for felony murder and in specifically doing so, meant for those exclusions to be the only limitations on the felony-murder offense). If the legislature had intended to include the merger doctrine as a limitation on the felony-murder rule, it could have easily done so. *Id.*

*Simino*, 397 S.W.3d at 24; *see also* **State v. Barker**, 410 S.W.3d 225, 235 (Mo. App. 2013) (Missouri courts' more recent decisions have clearly held that the merger doctrine under the current Missouri statutory scheme is no longer a viable theory); **State v. Dudley**, 303 S.W.3d 203, 207 (Mo. App. 2010) (merger doctrine no longer a viable theory); **Gheen**, 41 S.W.3d at 605 ("we hold that the merger doctrine, under the current Missouri statutory scheme, is no longer a viable theory").

Defendant argues the *Simino* Court's reliance on *Williams* is misplaced because that case was "based on the 'punishment' provisions of Section 565.021" and Defendant was not punished for the assault in this case. For this reason, Defendant requests this Court "eschew the reasoning of *Williams* and *Simino*" and return to earlier holdings "that assaultive behavior merges into the acts causing the death" as "the more correct analysis." We decline to do so. Although the *Williams* Court did rely on the penalty provision of the second-degree murder statute, the opinion made clear that both the "any felony" language and the penalty provision prohibit the application of the merger doctrine. In noting that courts had previously applied the merger doctrine despite the "any felony" language, the *Williams* Court assumed that those courts "did not see the application of the doctrine as a

9

case of statutory interpretation" and "courts are obligated to enforce the felony murder statute as written[.]"  *Williams*, 24 S.W.3d at 116-17; *see **State v. Burns***, 978 S.W.2d 759, 761 (Mo. banc 1998) (courts are obligated to follow and apply the law as written). Moreover, in holding that the second-degree murder statute abrogated the merger doctrine, other courts have based their decisions on the "any felony" language, not just the penalty provision.  *See, e.g.*, ***Dudley***, 303 S.W.3d at 207 (two features of the second-degree murder statute demonstrate a legislative intent that any felony can support felony murder (other than murder or manslaughter), one of which is the "any felony" provision in § 565.021.1(2)); ***Gheen***, 41 S.W.3d at 604 ("'any felony' means any offense chargeable as a felony"); ***Bouser***, 17 S.W.3d at 139 (the legislature "clearly chose" to delineate *"any felony"* as being capable of supporting a second-degree felony murder conviction; if the legislature had desired to limit the underlying felonies, it would have done so).  As in ***Simino***, the fact that Defendant here was not "punished" for assault had no bearing on the merger doctrine's viability.

Thus, the trial court did not plainly err in submitting Instruction Nos. 10 and 11 to the jury because the instructions were not prohibited by the merger doctrine.  Defendant's point is denied, and the judgment of the trial court is affirmed.


JEFFREY W. BATES, P.J. – OPINION AUTHOR

DON E. BURRELL, J. – CONCUR

MARY W. SHEFFIELD, C.J. – CONCUR